FILED

06/03/2022

Clerk of the
Appellate Courts

# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE AT NASHVILLE

February 9, 2022 Session Heard at Lipscomb University[1]

## STATE OF TENNESSEE v. ANTONIO MAURICE JACKSON

**Appeal from the Criminal Court for Davidson County**
**No. 2018-C-1717, 2017-A-845     Mark J. Fishburn, Judge**

_____

### No. M2020-01098-CCA-R3-CD
_____

The Defendant, Antonio Maurice Jackson, was convicted of three counts of second degree murder and two counts of aggravated assault after a bench trial. The trial court merged the homicide offenses and imposed an aggregate sentence of twenty-five years in prison. On appeal, the Defendant challenges the trial court's decision to admit the preliminary hearing testimony of a witness; the trial court's various evidentiary decisions; the trial court's rulings on self-defense; the trial court's refusal to require the State to make an election on various charges; the trial court's decision to convict the Defendant of second degree murder in Count 3 after announcing a verdict of acquittal from the bench and entering it in the minutes; and the sentencing determination. After a thorough review of the record, we conclude that the principles of double jeopardy prohibited the trial court from revisiting its acquittal, and we accordingly reverse the Defendant's conviction for second degree murder in Count 3. The Defendant's remaining convictions and sentences are affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed in Part; Reversed in Part**

JOHN EVERETT WILLIAMS, P.J., delivered the opinion of the court, in which TIMOTHY L. EASTER and JILL BARTEE AYERS, JJ., joined.

Jim Todd and Katie Hagan, Nashville, Tennessee, for the appellant, Antonio Maurice Jackson.

---

[1] Oral argument in this case was heard before students in the Fred D. Gray Institute for Law, Justice and Society on the campus of Lipscomb University, Nashville, Tennessee.

Herbert H. Slatery III, Attorney General and Reporter; T. Austin Watkins, Assistant Attorney General; Glenn Funk, District Attorney General; and Janice Norman and Brian Ewald, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

## FACTUAL AND PROCEDURAL HISTORY

The Defendant was engaged in a drug transaction in a motel room at around 6:30 a.m. on December 3, 2016, when he ultimately produced a firearm, hit Mr. Roger Reid with it, breaking Mr. Reid's cheekbone and nose, and held Mr. Reid and the homicide victim, Mr. Casey Lucas ("the homicide victim"), at gunpoint. When Ms. Hailey Haslam arrived at the motel room and the Defendant brandished his weapon at her, the homicide victim jumped on top of the Defendant. Ms. Haslam and Mr. Reid fled the room during the ensuing struggle, and the homicide victim was shot nine times. The Defendant was initially indicted for various offenses, but the State obtained a superseding indictment charging the Defendant with: (1) the first degree premeditated murder of the homicide victim; (2) the felony murder of the homicide victim during the perpetration of or attempt to perpetrate a robbery; (3) the felony murder of the homicide victim during the perpetration of or attempt to perpetrate first degree murder; (4) the felony murder of the homicide victim during the perpetration of or attempt to perpetrate kidnapping; (5) the especially aggravated robbery of the homicide victim of cash and/or cocaine accomplished with a deadly weapon where the victim suffered serious bodily injury; and (6) the especially aggravated robbery of Mr. Reid of a wallet and a cell phone accomplished with a deadly weapon where Mr. Reid suffered serious bodily injury. The Defendant proceeded with a bench trial. The defense theory at trial was that Mr. Reid, Ms. Haslam, and the homicide victim were attempting to rob the Defendant of his necklace, that he acted in self-defense in brandishing the weapon, and that the weapon discharged during the struggle when the homicide victim jumped on the Defendant.

Prior to trial, the Defendant moved for a bill of particulars, arguing that in the felony murders charged in Counts 2, 3, and 4, the State was required to elect whether the homicide was committed during the perpetration of the underlying felony or during the attempt to perpetrate the underlying felony. He also asserted that the State was required to identify the victim of each underlying felony. The Defendant argued that the count charging the especially aggravated robbery of the homicide victim should also specify whether the homicide victim was being robbed of cash or cocaine. The trial court denied the motion.

Approximately three weeks prior to trial, the prosecutor informed the court that the State would seek admission of Ms. Haslam's preliminary hearing testimony if she did not appear to testify. The prosecutor noted that the State had attempted to telephone Ms. Haslam, who was served with a subpoena approximately six months before trial, but had received no response. The defense opposed the admission of the testimony. Ms. Haslam did not appear on the first day of trial, and after listening to the arguments of the parties, the trial court ruled that the State had not at that point introduced sufficient evidence of its good faith efforts to locate the witness. The following day, the State presented the testimony of Mr. Steve Turner, an investigator in the District Attorney's office, who testified regarding his extensive but unsuccessful efforts to locate Ms. Haslam prior to serving her the subpoena. Although he was unsuccessful in locating her by visiting various addresses and relatives, he was able to serve the subpoena when she was arrested in February 2019 in Woodbury, Tennessee. Mr. Turner acknowledged that his only efforts to locate Ms. Haslam after serving the subpoena were to call her grandmother the morning he testified. Detective Derry Baltimore testified that when Ms. Haslam did not appear on the first day of trial, he followed up on information from her bonding companies by making several telephone calls, but he was not able to locate her. He also sought the assistance of the Sheriff's Department in DeKalb County to visit an address, but the Sheriff's Department was likewise unsuccessful. Ms. Haslam had not appeared at a hearing on an aggravated robbery charge in Rutherford County the previous week.

The trial court found that Ms. Haslam had been served with a subpoena, that the contacts listed on her bonds could not find her, and that Ms. Haslam had failed to appear in Rutherford County the previous week. The court concluded, "So, while I think certainly, the efforts to locate her could have started sooner… the overall record indicates that those efforts had been going on by a number of authorities, none of which have been successful in … finding her." The court found Ms. Haslam unavailable. It further found that the Defendant had the opportunity to cross-examine her at the preliminary hearing and that she was only in the room for seventeen seconds so "[t]here wasn't a whole lot to explore." The court determined that her preliminary hearing testimony was admissible.

At trial, the homicide victim's father, Mr. Mark Lucas, testified that on December 3, 2016, the homicide victim was thirty years old and living with his mother and Mr. Lucas. Ms. Haslam, who was the homicide victim's girlfriend, and her two toddler children were also living in the home. The homicide victim had been injured at work when a barn collapsed on him in March 2016, and he had limited mobility and pain at the time of his death. He received some workman's compensation, had begun working again on a limited basis, and received financial support from his parents. The homicide victim and Ms. Haslam would occasionally spend the night away from the house. The victim's father agreed that the victim was charged with robbery in 2014 even though he received financial support from his parents.

The State entered the transcript of Ms. Haslam's testimony from the preliminary hearing as an exhibit at trial. According to the transcript, Ms. Haslam testified that she had been dating the homicide victim for approximately three months and that they were living with his mother. The homicide victim, Ms. Haslam, and her children checked into a Super 8 motel around 9:00 p.m. on December 2, 2016, and they watched television and put the kids to bed. The room was a nonsmoking room, and both the homicide victim and Ms. Haslam stepped outside to smoke during the evening. She stated that they also both used cocaine in the elevated exterior corridor outside the room. The homicide victim had cocaine in what she described as a small amount, for "personal use." At some point, a man named Mario arrived at the motel room. Mario was the homicide victim's coworker, and Ms. Haslam testified that Mario did not, to her knowledge, come to buy drugs. The homicide victim and Mario were drinking beer, and Ms. Haslam was unhappy that a stranger was in the motel room with her children. She testified that at around 3:00 a.m. on December 3, 2016, she asked her friend to pick her up from the motel, and she left with her children. After she left, the homicide victim kept trying to contact her through her cell phone, but she was angry and did not answer. Detective Joseph Chadwick High of the Metropolitan Nashville Police Department ("MNPD"), who testified as an expert in the analysis of call detail records, confirmed through the telephone records that between 2:30 a.m. and the time of the shooting, there were a series of outbound calls and text messages from the homicide victim's phone to Ms. Haslam's phone. It was not possible to determine from the records if the parties spoke, but the calls were of very short duration. There was one inbound call from Ms. Haslam at 3:19 a.m.

While Ms. Haslam was gone from the motel room, the homicide victim left the room and met with Mr. Reid. Mr. Reid, who was serving a sentence in West Virginia at the time of trial, testified that on the morning of December 3, 2016, he was at the Knights Inn motel with a prostitute, and the homicide victim came to Mr. Reid's motel room at the prostitute's invitation. Mr. Reid had been acquainted with the homicide victim for approximately two weeks, and he testified that the three ingested cocaine, which the homicide victim had brought.

Meanwhile, in the early morning hours of December 3, 2016, the Defendant made plans to spend time with his friend, Ms. Danielle Owens, who was living with her teenaged daughter and young son on the west side of Nashville. Ms. Owens testified that she woke up that day around 5:00 a.m. and saw that the Defendant had sent her a message through a social media app. Ms. Owens called the Defendant, and he asked her to give him a ride. Detective High confirmed that the phone records indicated that Ms. Owens called the Defendant at 5:12 a.m. in a call lasting approximately five minutes. The records introduced through Detective High showed that the Defendant called the homicide victim at 5:18 a.m. on December 3, 2016, immediately after he had spoken with Ms. Owens, in a call that lasted approximately nine minutes.

Mr. Reid confirmed that the homicide victim received a call or text message and that the homicide victim told Mr. Reid and the prostitute that he had to go back to his motel room at the Super 8 motel. Mr. Reid stated that the homicide victim wanted to meet a friend who "had some clothes or something that he was supposed to look at or whatever the case was." Mr. Reid, the prostitute, and the homicide victim walked across the street to the Super 8 motel, but the prostitute discovered that "someone was coming over and they were supposed to be trading clothes for whatever, and she said she didn't want to be there for that." The two men escorted her back to the Knights Inn and returned to the Super 8 motel on foot.

Ms. Owens testified that after speaking to the Defendant in the early morning, she drove to the southeast side of Nashville, where she picked the Defendant up at an apartment complex. The Defendant instructed her to go to a main road near his house, and she assumed he wanted to go home. Instead, he asked her to stop by the Super 8 motel to retrieve his keys from his brother. Ms. Owens parked in the rear of the motel, but at the Defendant's direction, she moved her car so that it was near the front lobby. The Defendant made a call to determine which room to visit, and he left Ms. Owens in the car, where she took some "selfies," which were introduced into evidence. The Defendant's phone records indicated that the Defendant called the homicide victim at 6:14 a.m. in a call that lasted fewer than thirty seconds.

Video surveillance of the motel where the shooting occurred was introduced through MNPD Detective Desmond Sumerel. The video shows that Ms. Owens's vehicle arrived at 6:14 a.m. at the Super 8 motel, and she backed into a spot at the same time that the homicide victim and Mr. Reid were arriving on foot. Shortly before 6:16 a.m., the homicide victim and Mr. Reid reached the motel room, which was located on an elevated exterior corridor. Shortly before 6:17 a.m., the Defendant approached the motel room, peeked in through the cracked door, looked up and down the exterior corridor, then entered.

Mr. Reid testified that after he and the homicide victim entered the motel room, he went to the bathroom, and when he emerged, the Defendant was in the room. Mr. Reid was not acquainted with the Defendant, who was standing by the door, wearing "a do-rag, … a chain and a jacket." The Defendant asked who Mr. Reid was, and Mr. Reid responded, "[W]hy does it matter[?] [Y]ou're not here to see me." Mr. Reid testified that the Defendant told them he had seen a police vehicle and was concerned "like we were trying to set him up." Mr. Reid sat at the table near the door, putting marijuana into a "Swisher Sweet" cigarillo while the homicide victim and the Defendant talked about "business ideas," such as investing in a clothing store. The homicide victim asked the Defendant why he had not brought the clothes, and the Defendant responded he did not want to remove them from the car because the police were in the parking lot.

The homicide victim then asked the Defendant if he still wanted cocaine and if he had money, and the Defendant responded he wanted less cocaine than discussed. The Defendant then insisted that the homicide victim and Mr. Reid "do a line" of cocaine to demonstrate they were not police, and they each consumed cocaine on the nightstand between the two beds. Mr. Reid returned to the table near the door and continued "rolling up [his] blunt of marijuana." The homicide victim prepared some cocaine for the Defendant, but the Defendant had no way to transport it. Mr. Reid took out the foil lining of his cigarettes and gave it to the Defendant as a container for the cocaine. The homicide victim "gave him the stuff," but Mr. Reid did not see what quantity of cocaine was exchanged. Mr. Reid testified that the homicide victim had some amount of money that evening.

The occupants of the room heard a noise outside the door, and the Defendant began "acting all paranoid." Mr. Reid peeked out the window and saw that it was merely a motel occupant walking past, and the Defendant also walked to the window and looked outside. The video surveillance shows two faces peering out of the hotel room at 6:17 a.m. Ms. Owens testified that, while she was in the parking lot, a police vehicle drove through the parking lot, and she sent a text message to the Defendant that the police were there. The video surveillance shows the patrol car drive past Ms. Owens at 6:17 a.m. Ms. Owens testified that the Defendant responded to her text message by asking if she wanted to "come in" and that she responded, "[N]o, I'm ready to go." The Defendant replied that he was coming. The telephone records show a series of text messages exchanged between the Defendant's phone and Ms. Owens's phone between 6:19 and 6:25 a.m.

Mr. Reid testified that, after the drug exchange, the Defendant asked him if he was "strapped," and Mr. Reid and the homicide victim both told the Defendant that they had no firearms. Mr. Reid sat again at the table to smoke marijuana. He turned around to look at the Defendant, who "smacked [him] in the face with the gun." The Defendant ordered Mr. Reid to get on the ground, pointing the gun at the back of his head, and told the homicide victim to "give him all the sh*t." The homicide victim "threw the coke on the bed," and the Defendant said, "I know you've got more." The Defendant ordered the homicide victim to strip, and the homicide victim began to undress. The Defendant ordered Mr. Reid to strip as well, but Mr. Reid said to the Defendant that "if he wanted me to strip he had to take my clothes off himself." The Defendant took Mr. Reid's cell phone from his hip, reached into Mr. Reid's pants and removed his wallet, and attempted to unbuckle his belt.

Meanwhile, Ms. Haslam asked her friend to drive her and her children back to the motel. She testified at the preliminary hearing that she tried to call the homicide victim and send him a text message on her arrival but received no response. The telephone

records show that Ms. Haslam attempted to contact the homicide victim at 6:27 a.m., and she arrived in the parking lot shortly thereafter. At 6:29 a.m., the video surveillance shows Ms. Haslam leave the vehicle in which she had arrived. Ms. Haslam testified that upstairs, the door to the motel room was locked, so she knocked and saw someone look through the window. At that point, Ms. Haslam thought that maybe another woman was in the room. The video surveillance shows Ms. Haslam knocking, the curtains parting, and the door subsequently opening at 6:30 a.m. Ms. Haslam testified that the door was opened by someone standing behind it, and she entered.

Ms. Haslam saw a Black man whom she did not know lying face-down, and she saw the homicide victim squatting down toward the back of the room, near the head of the man lying on the floor. The homicide victim was not wearing pants. As soon as Ms. Haslam entered the room, a man behind the door grabbed her by her jacket and put a gun to her head. He walked her to the bed farthest from the door and bent her over the bed. When Ms. Haslam asked the homicide victim what was happening, the Defendant said, "Don't say anything b***h or I'll kill you." The homicide victim told her they were being robbed, and the man on the floor urged her to cooperate. Ms. Haslam stated she did not resist. Ms. Haslam heard the gun, which was at her head, "clicking back, like he was fixin' to shoot it." The homicide victim then "jumped up and got on top of him, and he was like, '[R]un, go get help.'" Ms. Haslam fled the room. According to the surveillance video, she only remained in the room for approximately seventeen seconds, and at 6:30 a.m., the video shows Ms. Haslam dash out of the door, fleeing the room.

Ms. Haslam testified that she heard gunshots while she was on the exterior stairway. The shots were back-to-back, and there were "so many I thought that he was behind me running after me trying to shoot me." She did not see where the man who was lying on the ground went. Ms. Haslam ran to the lobby and asked the people in the lobby to call the police. The man in the lobby did not appear to believe her when she said someone shot her boyfriend. The video from the motel lobby shows Ms. Haslam arriving and attempting to seek help. At one point in the video, she makes a motion as though holding a gun to her head. The video shows the clerk viewing the motel's video monitoring system with Ms. Haslam. The surveillance video then captures Ms. Haslam leaving the parking lot on foot at 6:39 a.m.

Mr. Reid's testimony of the shooting was similar to Ms. Haslam's testimony. He testified that, as he was lying on the floor after being hit by the gun, a knock sounded at the door, and the Defendant opened the door while hiding behind it. Mr. Reid was not acquainted with the homicide victim's girlfriend, Ms. Haslam, but he knew that the homicide victim had been expecting her. Mr. Reid testified that Ms. Haslam walked in and that the Defendant shut the door and put the gun to the back of her head, telling her that "if she screamed, he'll blow her f**king brains out." The Defendant forced her over

to the second bed and tried to force her down on the bed, but she "fought him off a little bit." The homicide victim then charged the Defendant, and "[t]hey were wrestling for the gun." Ms. Haslam fled immediately, and Mr. Reid, after a moment of hesitation, followed. The video confirms that Mr. Reid fled a few seconds after Ms. Haslam. Mr. Reid testified that when he reached the bottom of the stairs, he heard three shots. The surveillance video captures a bystander, who was sitting on the ground smoking a cigarette a few doors down, suddenly standing up in reaction to some stimulus around the time Mr. Reid reached the bottom of the stairs. The bystander moved quickly back into his room. Mr. Reid testified that, looking up, he thought he saw the Defendant at the top of the steps looking over the rail, then heard more gunshots. He stated that when he heard the additional shots, "I thought I was being shot at, but I wasn't."

Ms. Owens, who had remained in the parking lot, saw a white woman run "really fast" in front of her car. The Defendant arrived about a minute later, with his jacket pulled over his head. At 6:31, the video surveillance shows the Defendant leave the room with his jacket drawn over his head. Ms. Owens began to drive away, and she testified that the Defendant was "super calm" and acted normal. However, Ms. Owens noticed a drop of "fresh" blood on his pants. When she asked the Defendant about it, the Defendant moved his arm, and "blood [was] like coming from somewhere." The Defendant explained, "the b***h bit me, the white boy bit me, the b***h bit me." Ms. Owens inquired further, and the Defendant said he had gone to get money from a "white boy," that his ex-girlfriend arrived, and that he "mushed" his ex-girlfriend in the head. Ms. Owens testified, "I don't know if he said she bit his finger off or she bit his nail off. That's what he's saying, but it was a lot of blood."

Suspecting that something nefarious had taken place, Ms. Owens stopped at a shopping plaza and told the Defendant he had to leave her car. Ms. Owens felt hysterical and returned home, where she took photographs of the blood in her car before she and her daughter cleaned the car. Ms. Owens then contacted Mr. Joshua Dyer, through whom she had met the Defendant. Ms. Owens's call records indicate she called a number ending in 5911 at 6:41 a.m. Ms. Owens testified that Mr. Dyer came to her home and called the Defendant to ask about the blood. The Defendant had contact with the 5911 number at 7:33 for three seconds, at 7:42 for approximately three minutes, and 8:05 a.m. for approximately one minute. Detective High testified that the phone records also indicated that the Defendant placed several calls to Ms. Owens prior to 7:30 a.m. Ms. Owens testified that Mr. Dyer spoke to the Defendant and that he felt the Defendant was not being truthful. Ms. Owens then called the Defendant, and he repeated that he had been bitten by an ex-girlfriend. Ms. Owens asked him to let her listen in on a call between him and the ex-girlfriend to confirm that he was being truthful, but the Defendant instead offered her the ex-girlfriend's phone number. When Ms. Owens tried to call the number provided by the Defendant as his ex-girlfriend's, it was not working. The records show

that Ms. Owens called the Defendant at 7:41 and 7:58 a.m., in calls lasting approximately four minutes each. Immediately after the 7:58 call, she called a number ending in 7178, and Detective Baltimore testified that this was the number the Defendant had provided Ms. Owens as belonging to the Defendant's ex-girlfriend.

Mr. Dyer suggested to Ms. Owens that they go to the motel to see if there was a police presence there so that they could determine if anything criminal had occurred. However, en route to the motel, Ms. Owens's daughter forwarded a news article about a fatal shooting at the motel. Ms. Owens returned home and contacted the authorities. The parties stipulated that she called police at 8:41 a.m. Law enforcement arrived at her home, and she gave consent to search the vehicle and turned over the photographs of the blood in the vehicle. Law enforcement collected swabs from the areas where the photographs showed blood. Ms. Rachel Mack, an expert in serology and DNA analysis, testified that the DNA recovered from the car was consistent with the Defendant's DNA. Fingerprints from the vehicle were of no value. Ms. Owens went to the police department to give a statement. She spoke to the Defendant through Facetime on her way home from the police department but had no further contact with him.

On cross-examination, Ms. Owens denied that she had ever taken drugs with the Defendant or that she was going to the Super 8 to buy drugs. She stated that she was on probation out of Louisiana at the time and had a "blunt" in the car, and she said that was why she was nervous and sent the Defendant a text message about the police. She denied that she had a series of back-and-forth text messages with the Defendant between 6:20 and 6:25 a.m. Ms. Owens reiterated that the Defendant asked her, "[D]o you want to come in," but on redirect examination, she agreed she had stated at the preliminary hearing that he asked, "[A]re you trying to come in or are you trying to come up." Ms. Owens testified at trial that he had said "one of the two."

Mr. Reid testified that, after escaping from the motel room, he ran across a four-lane road to Quarters Inn, where the police were responding to an unrelated incident. The surveillance video shows Mr. Reid fleeing across four lanes of traffic, falling in his haste to escape, and nearly being struck by a vehicle. Mr. Reid testified that he told the police he needed help and that his friend had been shot, and the police did not believe him. Officer Justin McCormick confirmed that Mr. Reid ran up shouting, "[H]elp me, help me," in a panicked state with blood coming from his forehead. Mr. Reid told Officer McCormick that he had been shot at, robbed, and struck by a handgun. Officer McCormick had not heard shots fired, and he agreed with Mr. Reid's testimony that law enforcement were initially skeptical that a shooting had occurred. Officer Dezmond Hughes likewise testified that a "frantic" Mr. Reid, suffering from a head wound, said someone was shooting at him. Officer Hughes had not heard gunshots, but went to the room at the Super 8 and discovered the homicide victim's body. Officer Hughes

attempted to perform CPR, but he testified that photographs of the scene showed the homicide victim in the same position in which Officer Hughes found him.

Mr. Reid was taken to a hospital, and he was interviewed after he received medical treatment. Mr. Reid testified that he was bleeding quite a bit, and he suffered a fractured nose, fractured cheekbone, and an injury to his forehead. Detective Sumerel testified that he prepared a photographic lineup and that Mr. Reid was able to identify the Defendant. Detective Sumerel returned Mr. Reid's wallet and cell phone to him later in the day. Mr. Reid testified that he did not speak to Ms. Haslam prior to the interview, although he saw her sitting in the hallway at the police station. Officer McCormick also testified that Mr. Reid did not interact with Ms. Haslam at the scene.

Mr. Reid acknowledged that he told the police that he was homeless although he was not. He agreed that the room at the Knights Inn was not under his real name. Asked why he used a false name, he stated he did not have identification, but he acknowledged his identification card was in his wallet. He clarified that he had told the police he used a false name because of lack of identification but that his true reason was because he intended to use drugs in the room with a prostitute. He stated he was planning to pay the homicide victim for cocaine but never did. He agreed that at the preliminary hearing, he said he wanted the homicide victim to give the prostitute cocaine. He agreed that he told an officer he was struck with a gun after entering the room, but he clarified he did not say he was struck directly after he entered the room. Officer McCormick stated that Mr. Reid said that, as soon as he entered the room, he was struck on the back of the head with a gun and was subsequently hit on the face with the gun. Mr. Reid acknowledged telling police that he was smoking a cigarette outside the room when a man with a bag of clothes came up and telling police that he invited the man to show him the clothes in the room. He agreed this was a lie and that the surveillance videos contradicted his statement. Officer McCormick testified that Mr. Reid said something about a man asking him to go into a hotel room regarding a clothing line. Mr. Reid also agreed that he told a detective that he got a call from a man selling clothes. According to Mr. Reid, he did not at first tell the police that drugs were involved, but he began to tell the truth after he started to feel at ease during the interview at the police station. Mr. Reid acknowledged that his wallet, cigarettes, and cell phone were left in the motel room, "neatly stacked" on the table. He agreed he had said he was hit in the face and on the back of the head, and he testified he no longer remembered how many times he was hit.

Detective Baltimore testified that Mr. Reid had not seen the surveillance footage at the time he was interviewed, and he confirmed that Mr. Reid told him that Mr. Reid was smoking outside when a man offered to show him a bag of clothes. He agreed that the surveillance tape showed that this was not true. Detective Baltimore acknowledged that Mr. Reid said it was a robbery and that his wallet and cell phone were taken, although

- 10 -

both were recovered from the crime scene. He testified he did not believe Mr. Reid knew his possessions had been recovered at the time of the interview. He agreed there was no blood immediately where Mr. Reid claimed to have been sitting when struck, but he noted that one of the bloodstains was consistent with Mr. Reid's statement that he was lying on the floor nearby. Mr. Reid told Detective Baltimore he was homeless. Detective Baltimore was not aware that Mr. Reid had multiple phones.

Officer Pamela Caulder, who was leaving the scene of an unrelated disturbance at the Quarters Inn, was alerted that shots had been fired at the Super 8. She recalled that she had just seen a woman running across the street toward a gas station. As she pulled into the gas station, bystanders immediately pointed to Ms. Haslam who "was frantic and extremely frightened. She was hunched down on the side of the building and seemed to be distraught." Officer Caulder testified that Ms. Haslam exhibited "broken speech," and she said, "they're after me, did anybody get me, will anybody get me." Ms. Haslam was fearful and crouched down in the police vehicle and was reluctant to go with police. She kept asking about the wellbeing of a third person. Officer Caulder stated that Ms. Haslam remained in the police vehicle for approximately an hour before she was transported to the police station and that Ms. Haslam had no contact with any other witnesses. Officer Rickie Corman transported Ms. Haslam to the police station, and Ms. Haslam was "crying incessantly," "trembling," "shaking," and kept repeating, "[H]e saved my life."

Detective Baltimore interviewed Ms. Haslam, who was crying but able to give information. Ms. Haslam said that the Defendant shot at her and was trying to kill her. He did not recall her saying that the homicide victim told her they were being robbed. Instead, she said the homicide victim told her to cooperate. Ms. Haslam and Mr. Reid did not have contact prior to their interviews, but their descriptions of events were consistent. Ms. Haslam did not specifically say that the Defendant was behind the door, and Detective Baltimore could not recall if she said she heard the gun being cocked. Detective Sumerel prepared a photographic lineup, and Ms. Haslam picked an individual other than the Defendant. Detective Sumerel testified that she was "wavering" between the Defendant's photograph and the other man's photograph, but when asked to make her best guess, she picked the other man. He acknowledged he did not note her hesitation on the form. Detective Baltimore agreed that, according to Ms. Haslam's telephone records, the person she called from the hotel lobby was the homicide victim, and Detective High confirmed that she did not call 911.

The Defendant turned himself in approximately two to three days after the crime. He had an injury on his left thumb and scratches on the back of his hand. He did not have his cell phone. Detective High testified that at 4:44 p.m. on December 4, 2016, a call from Ms. Owens was forwarded directly to the Defendant's voicemail, with no tower

data available, which could indicate that the Defendant's cell phone was turned off. All the remaining calls made to the Defendant's phone, through December 10, 2016, were also forwarded directly to voicemail with no tower data available.

Detective Baltimore acknowledged he did not execute a search warrant on the Defendant's residence in an attempt to locate the weapon. Detective Baltimore also interviewed the woman from the Knights Inn whom Mr. Reid described as a prostitute. She told Detective Baltimore that she did not want to be at the Super 8 because she was "not comfortable." He did not recall if he asked her if her discomfort stemmed from the homicide victim and Mr. Reid's planning a robbery.

Officer Kenneth Wolfe and Officer Charles Linville, MNPD crime scene investigators, testified regarding the crime scene and introduced panoramic and interactive photographs of the scene. The room was in disarray, with a chair knocked over. On the bed, officers found children's toys and baggies containing suboxone film and a white pill. No cocaine or marijuana were recovered. On the table, Mr. Reid's wallet, cigarettes, and cell phone were stacked on top of one another. The homicide victim's body was between the two beds, and he was holding a necklace in his fingers. A cross pendant was on the floor between the bed and nightstand, and the homicide victim's phone with a pink case was on the nightstand. The nightstand had some damage, and some wood fragments from it were on the ground. There was a three-inch lock-blade knife on the floor, underneath a pair of shoes and near a watch. Ms. Mack testified that the watch contained DNA with multiple contributors, and the homicide victim was the major contributor to the DNA recovered from the back of the watch. The homicide victim's pants were on the bed nearest the door. The homicide victim's wallet, containing two United States $2 bills and two Bahamian $1 bills, was recovered from his pants. A black stocking cap was on the floor. Mr. Reid's wallet, cell phone, and cigarettes were not processed for fingerprints. The carpet and sheets were not vacuumed for evidence, and Officer Wolfe could not identify the white dots on the carpet. A package of "Swisher Sweet" cigars from the table was processed, and the fingerprints on it did not match the Defendant's fingerprints. There was a small bloodstain on the window unit and a stain on the carpet between the beds, near a chair. Ms. Mack analyzed bloodstains from the floor of the motel room, and they were from an unknown individual who was not the homicide victim or the Defendant. According to her report, which was introduced into evidence, a bloodstain from the exterior stairs contained the Defendant's DNA.

A total of seven Winchester and three Federal .40 caliber Smith & Wesson cartridge casings were recovered. Two projectiles and two fragments were recovered from the room. Detective Baltimore collected six projectiles which had been retrieved during the autopsy. Ms. Bridget Chambers, a forensic scientist with the MNPD, testified

as an expert in the field of firearms analysis. All ten casings were fired from the same weapon, and Ms. Chambers testified it was not uncommon for one gun to have multiple brands of ammunition. Analysis of the projectiles did not yield any conclusions about their origin.

Detective Sumerel acknowledged that he did not recall if police attempted to retrieve fingerprints from Mr. Reid's wallet or cell phone. He did not inspect Mr. Reid's wallet to see if it contained cash. He agreed that surveillance tapes from earlier in the evening were not recovered and that he did not know what time Ms. Haslam left or who else had been in the motel room that evening. He agreed that Ms. Haslam had a phone in her hand in the motel lobby but that she did not call 911.

Dr. Erin Carney, an expert in the field of forensic medicine, performed the homicide victim's autopsy and concluded that he died from multiple gunshot wounds and that the manner of death was homicide. Dr. Carney's report indicated that she had identified eight gunshot wounds, one of which was a graze wound. However, she testified that "upon further examination of the clothing," she believed there was a ninth graze wound on the back of the homicide victim's neck. Six bullets were recovered from his body, one from the lung, one in the left torso, two in the back, and one in the hip or thigh area. One bullet exited the homicide victim's body. The most serious gunshot wound traveled front to back, left to right, and downward, consistent with the homicide victim leaning over, kneeling or otherwise being positioned lower than the weapon. This projectile passed through his aorta, pulmonary trunk, and lodged in his lung, and it would have caused him to "bleed out" in one to two minutes. The bullets which entered the homicide victim's body traveled front to back and left to right, with some also traveling downward. Dr. Carney could not determine the order in which the shots were fired. The homicide victim suffered a blunt force injury to his head, and he had scratches on his forehead and chest. Dr. Carney concluded these were perimortem because they were bleeding slightly. The homicide victim also had scratches on his back, and abrasions on his hand, elbow, knee, leg, buttock, and back of the knee. Dr. Carney could not determine the range at which the weapon was fired. The homicide victim's blood contained cocaine, cocaine metabolites, and marijuana metabolites. She agreed that cocaine consumption could affect the homicide victim's ability to realize he was shot and that the penetrating wounds which did not go through his heart would not necessarily have stopped him from moving, depending on his pain threshold.

The Defendant moved for the State to elect whether the predicate felonies in the felony murder charges were based on an attempted or completed felony, and the trial court denied the motion. The Defendant also moved for acquittal on all charges, and the trial court granted the acquittal as to felony murder in the commission of or attempt to

commit kidnapping, noting that there had been no proof of confinement beyond that necessary to effect the robbery.

The Defendant called Detective Baltimore back to the stand, and Detective Baltimore testified that when he asked Ms. Haslam if she had "any idea why [the perpetrator] would be there," Ms. Haslam said that the homicide victim had just received a check for thirteen thousand dollars related to his work injury, and she said, "Maybe they were trying to rob him or something like – or something. I have no idea." Ms. Haslam also stated, "[A]ll I know is that [the homicide victim] told me, if I don't be quiet, the guy was going to shoot me, and if it wasn't for him, I wouldn't be alive right now." Asked if she thought it was a robbery, she said, "I think it was." Detective Baltimore agreed that Ms. Haslam did not tell him that the homicide victim told her they were being robbed and that she concluded her speculation that it was a robbery with "I have no idea." Ms. Haslam told Detective Baltimore that the Defendant said, "[S]hut up or I'll kill you right now," and she told him that she believed Mr. Reid was not the Defendant's accomplice because the Defendant was pointing the gun at herself, the homicide victim, and also at Mr. Reid.

The Defendant's testimony was that he thought he was being robbed and felt he acted in self-defense. He testified that he and two of his brothers had moved to Tennessee in 2009, to live near his third brother, who was a professional football player. In 2016, the Defendant's brother who played football no longer lived in the state but had rented a house to serve as the residence of the Defendant and another brother. The occupants of the home paid for utilities, and the Defendant also paid child support. The Defendant worked at a moving company, and he testified that his brother the football player was generous with money and would give him money on occasion, including to help with the Defendant's child support obligation.

On December 2, 2016, after coming home from work, the Defendant, who did not have a car or a license, drove his cousin's car to a gas station near the motel and bought beer and a pack of "Swisher Sweet" cigarillos, which he intended to use to "[r]oll marijuana." The Defendant did not know the homicide victim but met him at the gas station when the homicide victim, seeing the "Swisher Sweets," asked the Defendant if the Defendant had "any smoke." The Defendant told the homicide victim he did not. The homicide victim then volunteered that he could obtain drugs, pills, or cocaine, and the Defendant saved the homicide victim's phone number in his cell phone. The Defendant noted he was wearing a "couple of necklaces" while at the gas station, in particular the black chain with a black cross with diamonds in it, which was recovered from the homicide victim's hand in the motel room. The Defendant returned home and smoked marijuana with his brother and cousin in the car, then sent messages to Ms. Owens, in whom he was romantically interested. Sometime after 9:00 p.m., he drove his

cousin's car to a friend's apartment. As he parked, he heard something fall to the floorboard, and he realized his brother's gun was in the car. Because the locks on the car did not work, he put the gun into his pocket. Ms. Owens did not reply to his message until the morning. They spoke on the telephone, and she agreed to come pick him up and take him to her house. The Defendant explained that he did not want to drive more than a short distance because he had no license.

The Defendant had tried to contact a friend to obtain cocaine prior to Ms. Owens's call at 5:12 a.m., but he had not received a reply. He recalled that he had saved the homicide victim's phone number the previous evening and decided to contact the homicide victim to see if he had cocaine. The homicide victim agreed to procure cocaine for the Defendant. When Ms. Owens arrived, the Defendant asked her to drive him to the motel to get "some high," which he explained was cocaine. When they arrived, he contacted the homicide victim to find out the motel room number.

The Defendant said that when he walked into the room, the homicide victim appeared to be ingesting cocaine that was on the nightstand between the beds. The Defendant and homicide victim stayed near the nightstand and spoke for four or five minutes, in part about whether the homicide victim could provide Percocet pills for Ms. Owens, who had asked for the pills. The Defendant confirmed Ms. Owens's testimony that she sent him a text message that the police were on the premises, but the Defendant stated he was not nervous about the police because he "was just there to get a half a gram of cocaine." He asked Ms. Owens if she wanted to come up to the room, but she declined. At that point, Mr. Reid, wearing gloves, emerged from the bathroom, and Mr. Reid did not respond when the Defendant asked who he was. Mr. Reid stood by the window while the Defendant spoke to the homicide victim.

The Defendant testified that Mr. Reid suddenly grabbed the Defendant from the back by his jacket and shoulder and that the Defendant was "snatched back real hard." The Defendant testified that he thought the homicide victim and Mr. Reid were trying to "jump on [him] and take [his] necklace." When Mr. Reid grabbed the Defendant, the Defendant recalled that he had the gun and hit Mr. Reid on the head with it. Mr. Reid fell on the ground, and the Defendant pointed the gun at the homicide victim and asked him what was happening. The Defendant stated that the homicide victim began to walk toward the bathroom, pulling his shirt up and pants down to show he was unarmed. The Defendant denied ordering the homicide victim or Mr. Reid to disrobe. He said that Mr. Reid got up and was walking back and forth by the front door. The Defendant was moving the gun back and forth between the homicide victim, who remained toward the back of the room, and Mr. Reid, who was near the door. Ms. Haslam then walked through the door, angry and screaming.

The Defendant testified that he was standing between the beds, away from the head of the bed, and that he turned his attention to the two people near the door, at which point the homicide victim grabbed him around the neck. The Defendant stated he was five feet and six or seven inches tall. Dr. Carney testified that the homicide victim was five feet, eleven inches tall. They "tussled back and forth with the gun," and the Defendant heard the gun discharge. He stated that the homicide victim "[p]robably" had hands on the gun when it fired. The Defendant denied taking anything from the motel room, and he did not see any drugs other than those on the nightstand. He denied taking Mr. Reid's wallet or cell phone. He said he did not intend to kill, rob, or cause harm to anyone. He stated that when he went outside, he pulled his jacket over his head because he thought the jacket was his hoodie.

The Defendant did not tell Ms. Owens about the shooting because she was panicking. He did not recall telling Ms. Owens that someone bit him. After Ms. Owens asked him to leave her car, he called one of his brothers to pick him up but did not tell his brother about the shooting. The Defendant recalled speaking with Mr. Dyer, but according to the Defendant, the substance of their conversation was Mr. Dyer's warning him that Ms. Owens was at the police station. The telephone records indicate that the Defendant and Mr. Dyer had contact at 7:42 a.m. and 8:05 a.m. and that Ms. Owens called the police at 8:41 a.m. That night, he told one of his brothers about the shooting, and his brother advised him to hire an attorney. The Defendant later turned himself in with his attorney.

On cross-examination, the Defendant stated that his brother the football player did not give him an allowance but gave him money when he needed it. In 2018, he was working at a hotel in Nashville, and his brother was assisting him financially in the same manner. When asked about child support, the Defendant stated he had not asked his brother for $22,000 to pay back child support and that he did not think he asked his brother for $15,000 in 2016 when the child support was first assessed against him. He agreed he had only paid $883 in child support between 2016 and 2018, and he explained that he had custody of his child "most of the time" and did not feel he should pay child support. He at first denied lying about his finances in a December 2018 uniform affidavit of indigency but later acknowledged that he had lied to the court when he indicated in the affidavit that he had zero income or assets.

On cross-examination, the prosecutor questioned the Defendant about the events surrounding the shooting, asking him, "[Y]ou know that you're not allowed to have a gun, right?" The Defendant responded that he did not at the time think he was breaking the law by taking the gun, but he agreed he did have two felony convictions.

- 16 -

The Defendant testified that his nine-minute call with the homicide victim consisted entirely of the Defendant's asking if he could buy half a gram of cocaine, and that they did not agree on a price but that he knew it would cost him $25. He denied being one of the two people peering out of the window of the motel room at 6:17 a.m. He stated that although Mr. Reid "went down" between the beds, where the Defendant was standing, when the Defendant hit him with the gun, Mr. Reid subsequently stood up and went between the beds and the table near the door.

The Defendant denied ever firing the gun, stating that it "went off." He stated that "[a]ll ten times it went off, we [were] fighting over the gun." He said he did not intentionally pull the trigger. He denied saying he had "mushed" his ex-girlfriend's head and did not recall if he said someone bit him. He denied giving Ms. Owens a phone number which allegedly belonged to the person who bit him. He said that he put the gun into a kitchen drawer at his home and that he did not seek treatment for his injury.

The trial court excluded evidence regarding Ms. Haslam's participation in a 2019 aggravated robbery. The Defendant presented the testimony of Mr. Kai Ramos and Ms. Hailey Khan regarding a 2014 assault committed by the victim. After hearing all of the proposed testimony, the trial court ruled that it would admit testimony that the victim assaulted Mr. Ramos but would exclude testimony related to a purported robbery.

Mr. Ramos, who was serving a federal sentence in confinement, testified that the homicide victim assaulted him in 2014. He testified that he was arguing with Ms. Hailey Khan when the homicide victim jumped on him and put him in a choke hold. Mr. Ramos got the upper hand and released the homicide victim, who indicated that he only jumped on Mr. Ramos because he "thought [Mr. Ramos was] going to hit [Ms. Khan]." After being released, the homicide victim again tackled Mr. Ramos. The homicide victim ultimately pled guilty to simple assault.

Ms. Khan, who was also in confinement, testified that Mr. Ramos was her boyfriend in 2014. Her memory of the events was "foggy" because she was under the influence of opiates and alcohol that day. Ms. Khan confirmed that the homicide victim came up behind Mr. Ramos and choked him.

The Defendant argued that the law of self-defense should be applied to the offenses. The trial court ruled that self-defense was fairly raised as to the offense against Mr. Reid, concluding that if the Defendant's testimony were credited, Mr. Reid assaulted the Defendant first. The trial court ruled however, that self-defense was not fairly raised as to the homicide victim because there was no evidence that the homicide victim committed any violent act and no evidence that Mr. Reid's actions could be imputed to

the homicide victim. The court noted that, if a jury were present, it would instruct on self-defense as to Mr. Reid but not as to the homicide victim.

In determining guilt, the trial court made oral findings of fact. The court found that the Defendant had a belief he was being robbed but that the belief was not reasonable. It noted that the Defendant's own testimony contained no mention of either Mr. Reid or the homicide victim demanding any of the Defendant's property and that the proof established that Mr. Reid and the homicide victim were both unarmed. The court found that the Defendant's "cheap" necklace was torn off during a struggle, and it noted the Defendant never told anyone he was being robbed after the shooting. The trial court found the State had not proven premeditation beyond a reasonable doubt, and it convicted the Defendant of the lesser included offense of second degree murder in Count 1. The trial court likewise found, that although there was some evidence that the Defendant committed the homicide in the attempt to commit a robbery, the robbery was not established beyond a reasonable doubt, and it convicted the Defendant of the lesser included offense of second degree murder in Count 2, charging felony murder. The trial court, noting it had already found in the felony murder count that the predicate felony of robbery had not been established, convicted the Defendant of aggravated assault by both serious bodily injury and a deadly weapon committed against the homicide victim in Count 5 and aggravated assault committed against Mr. Reid in Count 6. The court noted that the Defendant was engaged in an unlawful activity and had a duty to retreat, and it found that the Defendant had an opportunity to flee but did not do so. The court made a credibility determination in favor of Mr. Reid's testimony that the Defendant initiated the altercation by striking Mr. Reid with the gun, and it did not credit the Defendant's testimony that Mr. Reid assaulted him. The court noted that, having found the Defendant to be the first aggressor, it rejected the theory of self-defense as the finder of fact.

In Count 3, charging felony murder in the attempt to commit first degree premeditated murder, the trial court found that although the Defendant had threatened Ms. Haslam's life and pulled back the slide to chamber a round, the State had not established beyond a reasonable doubt that the Defendant was actually attempting to murder Ms. Haslam. The parties asked the court to clarify its ruling in Count 3, and the trial court stated that it found the Defendant not guilty, observing, "there wouldn't be a lesser included offense that it could go to that would fall under felony murder. Is there?" The parties did not respond, and a sentencing hearing was set. The court's minutes for that day reflected that the Defendant was found guilty of the lesser included offenses set out above in Counts 1, 2, 5, and 6, "BUT NOT GUILTY OF FELONY MURDER."

At sentencing, the State noted that the trial court had acquitted the Defendant during the bench trial of felony murder committed in the attempt to commit first degree murder in Count 3, but that the court had clarified later that it was finding the Defendant

guilty of the lesser included offense of second degree murder. The trial court agreed that the proceedings had adjourned and that the court sent the parties the correction by email.

The Defendant's mother, Ms. Alma Jackson, testified at sentencing that the Defendant's brothers, friends, and father were present in court to support him, that he had a good character, and that he had not been in any legal trouble for a lengthy period of time. She stated the Defendant was a "humble child" and said, "[T]his is not his character." Prior to moving to Nashville, he lived with her and did some work such as laying tile. The Defendant gave an allocution stating that he was "sorry about what happened," that he went to buy drugs and did not intend for the offenses to happen, and that he apologized to the homicide victim's family.

The homicide victim's mother, Ms. Evelyn Lucas, gave a victim impact statement. She said that the homicide victim was a particularly kind and giving person. She noted that the homicide victim always asked her to give food to a homeless man they saw on their way home from school, that he sometimes would save his own lunch money to buy the man something, and that he would pull over on the interstate to help stranded motorists. She noted that he asked her to fix plates of food for people he knew who were struggling on Thanksgiving and that at the funeral home, people shared other stories of good deeds the homicide victim had performed. The homicide victim's father said that the homicide victim's death had a profound effect on the whole family and said that on some days, he could not leave the house.

The State argued that a number of enhancement factors applied. The defense noted that the trial court had acquitted the Defendant of the robbery charges, and in doing so had concluded that the Defendant did not intend to commit a robbery, but that the court nevertheless did not consider self-defense. The trial court responded, "Oh, but I did, actually, consider self-defense. I didn't accept that that was the way it was initiated." The court also noted that self-defense would not have applied because the Defendant had a duty to retreat. The defense noted that the trial court had stated it would not consider self-defense, and the court responded that it had "already kind of gone over it in my head" and "already negated it." The court stated, that "there was no reason to address it because I had already kind of evaluated it and I did not think it applied because he made no effort to retreat from that situation" and because the force used was beyond that necessary for the Defendant to extricate himself.

The parties agreed that the Defendant was a Range II offender for the aggravated assault convictions and a Range I offender for the murder convictions. The trial court found as enhancement that the Defendant had a history of criminal behavior in addition to that necessary to establish the range, citing several misdemeanor offenses and the Defendant's admitted marijuana use through 2019. The court found that there was more

than one victim, noting that Ms. Haslam was not the victim of any of the conviction offenses and that Mr. Reid was not a victim of the homicides. For the murder convictions, the trial court found the Defendant possessed a firearm. It found the Defendant had no hesitation about committing a crime when the risk to human life was high, noting that the Defendant was aware that he was bringing a firearm to a drug transaction, but the court gave the factor little weight due to the inherent dangerousness of the offenses. The trial court did not find any mitigating factors submitted by the Defendant,[2] noting that although the homicide victim jumped onto the Defendant, the Defendant had previously gained complete control of the room and had an opportunity to flee. The trial court sentenced the Defendant to twenty-five years in prison for each of the second degree murder convictions and to concurrent ten-year terms for each of the aggravated assault convictions. The homicide convictions were merged.

The Defendant filed a motion for a new trial, raising numerous issues, including those raised on appeal. The trial court entered an order denying the motion.[3] The court concluded that the evidence was sufficient, that it had not committed error in admitting Ms. Haslam's testimony, that it did not err in limiting testimony from Mr. Ramos or Ms. Khan, that the Defendant was not entitled to any relief regarding election because the court had convicted him of the lesser included offenses of second degree murder and aggravated assault, and that the Defendant's prior record was relevant to self-defense. The court found it had not erred in its determination regarding self-defense, noting that the Defendant was required to but failed to retreat and that the Defendant's response was "far greater than necessary to avoid death or serious bodily injury." The trial court found it had not erred in sentencing. The Defendant appeals.

## ANALYSIS

On appeal, the Defendant asserts that the trial court erred in: 1) finding that Ms. Haslam was unavailable and admitting her testimony from the preliminary hearing; 2) its evidentiary decisions, including limiting testimony regarding the homicide victim's robbery charge, excluding Mr. Richardson's testimony, admitting evidence regarding the Defendant's affidavit of child support, admitting Mr. Reid's testimony regarding the homicide victim's reason for returning to the Super 8, and allowing the Defendant to be cross-examined regarding his prior felony convictions; 3) failing to consider self-defense in the homicide offenses and failing to rule on the issue of retreat regarding the offense against Mr. Reid; 4) failing to require the State to elect between the attempted and completed predicate felony for the felony murder counts, to elect the victim of the

---

[2] The Defendant referenced a sentencing memorandum that is not included in the record.

[3] The amended motion was filed in June 2020, and the record does not reflect whether a hearing was held.

predicate felony in the felony murder counts, or to elect the item taken during the robbery of the homicide victim; 5) imposing a conviction for second degree murder after having acquitted the Defendant on Count 3; and 6) sentencing, including the application of enhancement and mitigating factors.

## I. Admission of Ms. Haslam's Prior Testimony

The Defendant asserts that the trial court erred in finding Ms. Haslam unavailable and allowing her testimony from the preliminary hearing to be introduced at trial, contending that the State failed to demonstrate adequate efforts to locate Ms. Haslam and arguing that he did not have an adequate opportunity and similar motive to cross-examine her at the preliminary hearing, resulting in a violation of his rights under the Confrontation Clause. *See* U.S. Const. amend. VI. The State responds that the prosecution demonstrated adequate efforts and that there was no confrontation violation. We conclude that the record as a whole demonstrates adequate good faith efforts and that the Defendant had a prior opportunity and similar motive to cross-examine Ms. Haslam.

Approximately three weeks prior to trial, the prosecutor told the trial court that the State was not certain it could locate Ms. Haslam, who had been served with a subpoena in jail in February for the August trial. The prosecutor stated that the State had attempted to contact her by phone: "The voicemail that we called says ['H]ey, this is Hailey.['] We left messages, but we haven't received any return calls." The court indicated that Ms. Haslam should be made aware she could be arrested for noncompliance with the subpoena, and the State indicated it would file a motion to have her declared unavailable if she did not appear.

On the first day of trial, the prosecutor noted that Ms. Haslam had been served with a subpoena, that there were warrants for her arrest out of Rutherford County and Cannon County, that the State had verified she was not in custody, and that the State's investigator and victim/witness coordinator had attempted to contact her by phone multiple times without success. The prosecutor stated that she personally had attempted, together with the victim/witness coordinator, to call Ms. Haslam and that she had left messages identifying herself and asking Ms. Haslam to call her back but had received no response. The defense opposed the motion. Defense co-counsel testified that she had attempted to contact Ms. Haslam, who had an aggravated robbery charge and a drug charge in Rutherford County. Co-counsel had spoken with Ms. Haslam's Rutherford County defense attorney the prior week, and the attorney had expected Ms. Haslam to appear for her court date on that day. The parties noted Ms. Haslam had missed her court appearance. Co-counsel stated that two separate bonding companies would have information regarding Ms. Haslam's whereabouts. Co-counsel also testified that Ms. Haslam had failed to appear on a violation of probation charge in Cannon County. The

trial court ruled that the State had not, at that point, introduced sufficient evidence to satisfy the requirement of good faith efforts to locate the witness under Rule 804.

The following day, the State's investigator, Mr. Turner, testified regarding his attempts to locate Ms. Haslam. Prior to serving her with the subpoena in February 2019, he had gone to addresses in Alexandria, Smyrna, Murfreesboro, and Woodbury, Tennessee, locations which were based on information that she was staying with family members and on information from prior arrests. Ms. Haslam's grandmother said that Ms. Haslam sometimes stayed there, but despite several attempts to visit the grandmother at different times of day, Mr. Turner was never able to find Ms. Haslam. When Ms. Haslam was in custody in Woodbury, Tennessee, he was able to serve her on February 19, 2019, with a subpoena for trial on August 26, 2019. He stated that after serving the subpoena, the only effort he had made to contact her was to call her grandmother on the morning of the second day of trial.

Detective Baltimore testified that when Ms. Haslam did not appear on the first day of trial, he attempted to locate her by following up on information from her bonding companies, and he made several telephone calls. Ms. Haslam's grandmother told Detective Baltimore she was "kind of worried about" Ms. Haslam and had been looking for her. Detective Baltimore asked the Sheriff's Department of DeKalb County to visit the Alexandria address previously investigated by Mr. Turner early in the morning in hopes of catching Ms. Haslam asleep, but the Sheriff's Department could not locate her. Detective Baltimore called the number listed as a "good number" on the subpoena, but the person who answered said it was the wrong number. He testified that Ms. Haslam had always appeared for prior court hearings in the case.

The prosecutor noted that when the trial was previously continued, Ms. Haslam was late but ultimately appeared, despite an outstanding warrant. The prosecutor also stated that the State had tried to trace the surety on Ms. Haslam's bond but that it was her grandmother, with whom they had had extensive contact about attempting to locate Ms. Haslam. The trial court found that Ms. Haslam had been served with a subpoena, that the contacts listed on her bonds could not find her, and that Ms. Haslam had failed to appear in Rutherford County the previous week. The court found that although the State's efforts to locate her "could have started sooner," "a number of authorities" were looking for Ms. Haslam without success and further efforts by the prosecution would have been unsuccessful. The defense objected, arguing that admitting the testimony would be a due process violation because the defense did not have discovery at the time Ms. Haslam was cross-examined at the preliminary hearing and was accordingly unable to impeach her. The trial court concluded that that the Defendant had an adequate opportunity to cross-examine Ms. Haslam, noting she was in the motel room for only seventeen seconds.

- 22 -

Generally, prior testimony is hearsay, or as a statement, other than one made by the declarant while testifying, offered for the truth of the matter asserted. *State v. Jones*, 568 S.W.3d 101, 128 (Tenn. 2019); Tenn. R. Evid. 801(c). Hearsay is generally not admissible. Tenn. R. Evid. 802. However, under Tennessee Rule of Evidence 804, former testimony of an unavailable witness may be admissible under some circumstances. A witness is unavailable when, as pertinent here, the witness "is absent from the hearing and the proponent of a statement has been unable to procure the declarant's attendance by process." Tenn. R. Evid. 804(a)(5). When the declarant is unavailable, the Rule against hearsay does not exclude former testimony, which is "[t]estimony given as a witness at another hearing of the same or a different proceeding …, if the party against whom the testimony is now offered had both an opportunity and a similar motive to develop the testimony by direct, cross, or redirect examination." Tenn. R. Evid. 804(b)(1). This Rule applies to preliminary hearing transcripts. Tenn. R. Evid. 804, Advisory Comm'n Cmt. A trial court's decision to admit prior testimony is reviewed for abuse of discretion. *State v. Summers*, 159 S.W.3d 586, 597 (Tenn. Crim. App. 2004). The trial court's factual findings are binding on the appellate court unless the evidence preponderates against them, but the determination of whether a statement is hearsay or whether it fits into an exception to the rule against hearsay are questions of law reviewed de novo. *Kendrick v. State*, 454 S.W.3d 450, 479 (Tenn. 2015).

"Intertwined with the rules on the admissibility of hearsay is the constitutional right to confront witnesses." *Jones*, 568 S.W.3d at 128. The Sixth Amendment to the United States Constitution guarantees the accused the right "to be confronted with the witnesses against him." U.S. Const. amend. VI. The Tennessee Constitution provides the corresponding right "to meet witnesses face to face." Tenn. Const. art. I, § 9. The same standards apply in interpreting a defendant's confrontation rights under the Tennessee and United States Constitutions. *See State v. Hutchison*, 482 S.W.3d 893, 905 (Tenn. 2016). The Confrontation Clause governs only testimonial hearsay, and it applies only to testimonial statements offered for the truth of the matter asserted. *State v. Dotson*, 450 S.W.3d 1, 63-64 (Tenn. 2014). Prior testimony is inadmissible under the Confrontation Clause unless the witness appears at trial or the witness is unavailable and the defendant had a prior opportunity to cross-examine the witness. *Jones*, 568 S.W.3d at 128-29 (citing *Crawford v. Washington*, 541 U.S. 36, 68 (2004)). A trial court's determination regarding whether a witness is unavailable is reviewed for abuse of discretion. *Id.* at 129. Whether the admission of hearsay statements violated a defendant's confrontation rights is a question of law subject to de novo review. *State v. Davis*, 466 S.W.3d 49, 68 (Tenn. 2015).

To preserve a defendant's right to confrontation, the State must make a good faith effort to secure the presence of the witness. *State v. Sharp*, 327 S.W.3d 704, 712 (Tenn. Crim. App. 2010) (citing *State v. Henderson*, 554 S.W.2d 117, 120 (Tenn. 1977)). "Good

- 23 -

faith" is "'[t]he lengths to which the prosecution must go to produce a witness ... [and] is a question of reasonableness.'" *Id.* (citing *Ohio v. Roberts*, 448 U.S. 56, 74 (1980), *overruled on other grounds by Crawford*, 541 U.S. at 60).

In *State v. Summers*, the State had not established that the witness was actually served with a subpoena, but the record showed that he was aware of the proceedings and that he intentionally fled and hid to avoid testifying. 159 S.W.3d at 596-98. The witness's mother testified that he left town without telling her of his destination, and an investigator and detective "testified about the attempts they made to find" the witness. *Id.* at 596-97. The witness's attorney informed him of the consequences of absenting himself. *Id.* at 597. This court concluded that this evidence was sufficient to support a finding that the State made good faith efforts to locate him but was not able to do so. *Id.* at 598. In making the determination regarding good faith efforts, Tennessee courts have considered evidence that a witness was evading contact with the State and evaluated whether the record contained evidence of reasonable efforts to contact the witness. *See e.g., Jones*, 568 S.W.3d at 129 (sufficient efforts were made when the State contacted multiple jurisdictions in Florida, contacted the witness, who said he would not testify, introduced evidence regarding law enforcement's attempts to locate him, requested certificates from the court to ensure his presence, arranged for a summons which a court found the witness was evading, and attempted to contact the witness through relatives and a girlfriend); *State v. Justin L. Kiser*, No. E2019-01296-CCA-R3-CD, 2020 WL 3251172, at *10 (Tenn. Crim. App. June 16, 2020), *perm. app. denied* (Tenn. Nov. 16, 2020) (noting despite waiver that evidence of good faith efforts was sufficient when the witness had no permanent address and was avoiding contact with the State due to a warrant, and when the detective contacted the witness's family members, a local sheriff's office, and ultimately the United States Marshals); *State v. Charles Lee Warner*, No. M2016-02075-CCA-R3-CD, 2018 WL 2129509, at *16 (Tenn. Crim. App. May 9, 2018) (efforts were sufficient when the witness was served with a subpoena a month before trial while in custody and when the detective, on discovering the witness had been released, contacted the witness's father, went to his last known address, visited motels and a home assistance community, and interviewed members of the homeless community in an attempt to locate him); *State v. Bobby Jackson*, No. W2009-02232-CCA-R3-CD, 2011 WL 1849096, at *1, 7 (Tenn. Crim. App. May 11, 2011) (the State presented evidence of good faith efforts when the witness coordinator testified that the unavailable witness planned to go to Mexico and that he attempted to locate the witness in Mexico by calling the number the witness gave and when a detective used various databases to attempt to locate the witness and visited the witness's local address and "no one knew where [the witness] had gone"); *State v. Calvin Eugene Bryant, Jr.*, No. M2009-01718-CCA-R3-CD, 2010 WL 4324287, at *18 (Tenn. Crim. App. Nov. 1, 2010) (evidence that a detective visited a number of previous addresses and made numerous calls beginning a week

before trial and that the witness was aware he needed to cooperate with police was sufficient to establish good faith efforts).

On the other hand, in *Sharp*, the State had been aware for a number of months that the witness had moved out of Tennessee. 327 S.W.3d at 712. The State had repeatedly tried to contact the witness at one telephone number over a period of six to eight months but took no other steps to locate her. *Id.* This court concluded that the telephone calls did not constituted a "good faith effort" to locate the witness. *Id.* Likewise, in *State v. Armes*, the prosecution did not make sufficient good faith efforts to locate the witness when the witness had previously failed to appear and when the State merely issued subpoenas one week and one day before trial and neither was actually served on the witness. 607 S.W.2d 234, 236-37 (Tenn. 1980); *see State v. Tommy Brown, Jr.*, No. W2006-02529-CCA-R3-CD, 2008 WL 141128, at *4 (Tenn. Crim. App. Jan. 11, 2008) (the trial court did not abuse its discretion in finding that the State failed to make good faith efforts when the State was aware that the witness was in Missouri but failed to issue an out-of-state subpoena and instead relied on the witness's mother's assurance that he would appear).

In the case at bar, the State's efforts exceed those found inadequate in *Sharp*, *Armes*, and *Tommy Brown, Jr.* Prior to serving the subpoena, Mr. Turner had visited numerous addresses at various times in an attempt to locate Ms. Haslam, but she was successful in evading him until her arrest in February 2019. Ms. Haslam was served with a subpoena in jail six months prior to trial and knew when trial would take place. The State had attempted to contact her prior to trial by telephone at a number where the outgoing voice message used her name, and Mr. Turner called her grandmother. Ms. Haslam had outstanding warrants in two counties. The week before trial, she failed to appear for a hearing on her charge for aggravated robbery in Rutherford County. When Ms. Haslam did not appear on the first day of trial, Detective Baltimore contacted her bonding company, and he made several telephone calls following up on information they provided. He contacted Ms. Haslam's grandmother, who was worried about Ms. Haslam and could not locate her. Detective Baltimore requested the Sheriff of DeKalb County to visit an address associated with Ms. Haslam early in the morning in hopes of catching her asleep, but they could not locate her. While we agree with the trial court that the State's efforts to locate Ms. Haslam immediately prior to trial could have begun sooner, the trial court also essentially found that Ms. Haslam was evading contact and that further efforts to locate her would have been futile. *See Hardy v. Cross*, 565 U.S. 65, 70 (2011) (noting that "'the great improbability that such efforts would have resulted in locating the witness, and would have led to her production at trial, neutralizes any intimation that a concept of reasonableness required their execution'" (quoting *Roberts*, 448 U.S. at 76)). "[T]he Sixth Amendment does not require the prosecution to exhaust every avenue of inquiry, no matter how unpromising." *Id.* at 71-72. We conclude that the State showed

that it made a good faith effort to contact Ms. Haslam and took reasonable steps in doing so. *See Sharp*, 327 S.W.3d at 712. Accordingly, the trial court did not err in determining that the State was unable to procure the witness by process under Tennessee Rule of Evidence 804(a)(5) or that it made adequate good faith efforts to secure the witness in order to satisfy the Defendant's right to confrontation.

The Defendant argues that even if Ms. Haslam was unavailable, the preliminary hearing testimony should have been excluded because he did not have an adequate opportunity to cross-examine the witness at the time. The State responds that the preliminary hearing testimony was properly admitted. "A preliminary hearing transcript 'is precisely the type of former testimony contemplated under [Rule 804(b)(1)].'" *State v. Bowman*, 327 S.W.3d 69, 88-89 (Tenn. Crim. App. 2009) (quoting *State v. Michael Dwayne Hatfield*, No. 03C01-9307-CR-00233, 1994 WL 102072, at *3 (Tenn. Crim. App. Mar. 29, 1994)); *see* Tenn. R. Evid. 804(b)(1), Advisory Comm'n Cmts. This is because "[i]n a preliminary hearing, as at trial, the primary issue is whether or not the defendant committed the offense." *State v. Christopher Terrell Shipp*, No. M2016-01397-CCA-R3-CD, 2017 WL 4457595, at *5 (Tenn. Crim. App. Oct. 5, 2017) (citing *State v. Howell*, 868 S.W.2d 238, 251 (Tenn. 1993); *State v. Brian Eric McGowen*, No. M2004-00109-CCA-R3-CD, 2005 WL 2008183, at *11 (Tenn. Crim. App. Aug. 18, 2005)). "Complete identity of the issues is not necessary," so long as the issues are sufficiently similar to give a similar motive for cross-examination. *Howell*, 868 S.W.2d at 251. "'[T]he Confrontation Clause guarantees only an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish....'" *Davis*, 466 S.W.3d at 68 (quoting *United States v. Owens*, 484 U.S. 554, 559 (1988)). Indeed, "[c]ourts of this state have consistently upheld the admission of testimony from a preliminary hearing when the defendant had an opportunity to cross-examine a witness who was subsequently deemed unavailable." *Charles Lee Warner*, 2018 WL 2129509, at *17 (citing cases).

The Defendant asserts that he was charged only with criminal homicide at the time of the hearing and that new issues were raised by the charges on which he was subsequently indicted. However, the record does not reflect the charges at the time of the hearing, and it establishes only that the Defendant was indicted in March 2017 for numerous offenses, including the attempted first degree murder of Ms. Haslam, prior to the superseding indictment returned in 2018. *See* Tenn. R. App. P. 24(b) (noting that the appealing party bears the burden of providing an adequate record). In any case, "[c]omplete identity of the issues is not necessary" so long as the issues are sufficiently similar to give a similar motive for cross-examination. *Howell*, 868 S.W.2d at 251 (upholding the admission of hearing testimony from a different state when the defendant's identity as the killer of the two victims was at issue in both the Oklahoma and Tennessee trials). The primary issue at both the preliminary hearing and the trial was

the nature of the circumstances surrounding the shooting of the homicide victim. Ms. Haslam was cross-examined regarding the use of drugs in the hotel, her motivation for leaving in the middle of the night with her children, her entry into the hotel lobby, and the fact that she did not see the shooting. We conclude that the issues were sufficiently similar to give the Defendant a similar motive for cross-examination.

The Defendant also asserts that he did not have access to certain discovery materials and was not able to impeach Ms. Haslam with her prior statements to law enforcement, her failure to identify the Defendant from a photographic lineup, her statement that she believed the Defendant was running after her trying to shoot her, or her failure to call 911 in the hotel lobby. In *Christopher Terrell Shipp*, the unavailable witness had identified the defendant, with whom she was acquainted, as the perpetrator, but the defense did not, at the time of the preliminary hearing, have access to the witness's prior statement to law enforcement that the defendant had a facial tattoo. 2017 WL 4457595, at *5. The testimony at trial was that he had no tattoo but a "shadowing close to his cheek bones." *Id.* at *2. This court noted that "'[c]omplete identity of the issues is not necessary'" under Rule 804 and that the defendant thoroughly cross-examined the witness regarding the identity of the shooter at the preliminary hearing. *Id.* at *5, 7 (quoting *Howell*, 868 S.W.2d at 251). We noted that while the witness was not cross-examined about her statement, she was thoroughly cross-examined about the identity of the shooter and that the jury heard testimony that she had told police that the defendant had a tattoo on his face. *Id.* at *7. Accordingly, this court concluded that the preliminary hearing testimony was properly admitted under both Rule 804 and the Confrontation Clause. *Id.* at *6, 7.

Likewise, Ms. Haslam's statements to law enforcement and failure to identify the Defendant in a photographic lineup were introduced through the detectives, and security footage and telephone records established that the Defendant was not shooting at Ms. Haslam from the balcony and that she did not call 911. We conclude that the trial court properly admitted the testimony under Tennessee Rule of Evidence 804(b)(1) because the Defendant "had both an opportunity and a similar motive to develop the testimony by direct, cross, or redirect examination." Tenn. R. Evid. 804(b)(1). Likewise, the Defendant's right to confrontation was not violated when he had the opportunity and similar motive to cross-examine Ms. Haslam about the offense during the preliminary hearing. *See Charles Lee Warner*, 2018 WL 2129509, at *17 (rejecting the argument that lack of discovery at the preliminary hearing violated the defendant's right to confrontation because he could not meaningfully cross-examine the witness); *State v. Robert Echols*, No. W2013-02044-CCA-R3-CD, 2014 WL 6680669, at *13 (Tenn. Crim. App. Nov. 26, 2014) (rejecting under a plain error analysis the contention that testimony from the preliminary hearing was not admissible due in part to lack of discovery and

concluding that the defendant had an opportunity and similar motive to cross-examine the witness).

## II. Evidentiary Rulings

The Defendant challenges various evidentiary rulings made by the trial court. Questions regarding the admissibility of evidence are generally within the discretion of the trial court. *State v. Franklin*, 308 S.W.3d 799, 809 (Tenn. 2010). A trial court abuses its discretion when it applies an incorrect legal standard, reaches an illogical conclusion, bases its decision on a clearly erroneous assessment of the evidence, or employs reasoning that causes an injustice to the party complaining. *State v. Herron*, 461 S.W.3d 890, 904 (Tenn. 2015).

### A. Limitation on Testimony Regarding the Homicide Victim's Robbery Charge

The Defendant objects that the trial court limited testimony from Mr. Ramos and Ms. Khan to evidence regarding the homicide victim's attacking Mr. Ramos from behind and did not admit testimony regarding the robbery. The State argues that the evidence was properly excluded under Tennessee Rule of Evidence 404(b). We conclude that the trial court did not err in excluding the evidence.

Prior to trial, the defense sought to admit testimony regarding the homicide victim's prior involvement with a robbery, and the trial court found that evidence regarding the robbery would be admissible if the issue of the homicide victim's being the first aggressor was fairly raised. The court noted during the cross-examination of the homicide victim's father that it would not consider the evidence for propensity but that "robbery, being a crime of violence against another person, could have some relevancy to first aggressor." The court clarified later during the trial that it would consider violent conduct but not the planning of the robbery, reiterating that while the planning was propensity evidence, "[h]is acting on the plan is relevant to the case."

The Defendant testified that the homicide victim jumped on him from behind and that he felt Mr. Reid and the homicide victim were trying to rob him of his necklace. He then sought to introduce testimony that the homicide victim had been involved in a prior robbery during which he jumped on a man from behind. The trial court listened to all of the proffered testimony and determined it would only consider the assaults.

Mr. Ramos testified that in 2014, he was romantically involved with Ms. Khan and was test driving her vehicle. Mr. Ramos's cell phone had broken, and Ms. Khan had his contacts in her phone. Mr. Ramos argued with Ms. Khan, telling her to give him her phone while they were in a driveway. The homicide victim then attacked Mr. Ramos

from behind and put him in a chokehold. Mr. Ramos put the homicide victim in a headlock and punched him in the face. The homicide victim signaled surrender, explaining his attack by saying, "I thought you were going to hit her." When Mr. Ramos released the homicide victim and turned to Ms. Khan to ask for his jacket, the homicide victim again tackled him from behind. The two rolled on the ground, and Mr. Ramos's wallet fell out. The homicide victim grabbed the wallet, fled in the truck, and was arrested for robbing Mr. Ramos. According to Mr. Ramos, the police told him that they thought Ms. Khan "was in on it" after looking at text messages between the two. The homicide victim pled guilty to simple assault. After hearing the testimony, the court clarified that it would have permitted a jury to consider the homicide victim attacking Mr. Ramos from behind twice but would have excluded the testimony regarding the taking of the wallet.

Ms. Khan testified that she was under the influence of opiates and alcohol that day and had an imperfect memory of the incident. She agreed that they were in a truck that was for sale, but she did not recall if Mr. Ramos was test driving it and did not recall an argument about a cell phone. She believed that the homicide victim was with them because he was acquainted with Mr. Ramos, and she did not recall a prior acquaintance with the homicide victim. Ms. Khan confirmed that the homicide victim came up behind Mr. Ramos and choked him. Regarding the wallet, Ms. Khan said, "I don't know how the wallet got on the ground, if the wallet fell out on the ground, I pulled it out of his pocket. I'm not sure. I know that I handed the wallet to [the homicide victim]." Ms. Khan elaborated that the homicide victim asked her for the wallet and she gave it to him, feeling herself in danger. She was arrested shortly thereafter on an unrelated charge and did not speak to Mr. Ramos again. The court noted that, after hearing Ms. Khan's testimony, it did not believe that a robbery was adequately established by clear and convincing evidence and that in any event, it would consider as admissible the testimony regarding the physical attack rather than the subsequent taking of the wallet.

At trial, the parties analyzed the admissibility under Rule 404(b) concerning "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person." We note that "[t]he word 'person' in Rule 404(b) has been construed to refer solely to the defendant in a criminal prosecution." Tenn. R. Evid. 404(b), 2005 Advisory Comm'n Cmt. (citing *State v. Stevens*, 78 S.W.3d 817, 837 (Tenn. 2002)). However, statute now effectively applies the rule to a deceased victim or other witness in a criminal case. *State v. William Eugene Moon*, No. M2019-01865-SC-R11-CD, __ S.W.3d __, 2022 WL 1160781, at *7 (Tenn. Apr. 20, 2022). Under Tennessee Code Annotated section 24-7-125:

> In a criminal case, evidence of other crimes, wrongs, or acts is not
> admissible to prove the character of any individual, including a deceased

victim, the defendant, a witness, or any other third party, in order to show action in conformity with the character trait. It may, however, be admissible for other purposes. The conditions which must be satisfied before allowing such evidence are:

(1) The court upon request must hold a hearing outside the jury's presence;

(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;

(3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

(4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

T.C.A. § 24-7-125. A trial court's decision to admit evidence under Tennessee Code Annotated section 24-7-125 is reviewed for abuse of discretion if the trial court substantially complied with the procedural requirements of the statute. *William Eugene Moon*, 2022 WL 1160781, at *7 n.11.

The trial court also analyzed the proffered evidence as relevant to whether the homicide victim was the first aggressor, and the Defendant asserts it is admissible under Rule 404(a). Under Rule 404(a):

(a) **Character Evidence Generally**. Evidence of a person's character or trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion, except:

…

(2) *Character of Alleged Victim.* In a criminal case, and subject to the limitations imposed by Rule 412, evidence of a pertinent trait of character of the alleged victim of the crime offered by an accused or by the prosecution to rebut the same, or evidence of a character trait of peacefulness of the alleged victim offered by the prosecution in a homicide case to rebut evidence that the alleged victim was the first aggressor….

Tenn. R. Evid. 404(a). The method of proving a character trait under Rule 404(a), when such evidence is admissible, is governed by Tennessee Rule of Evidence 405. *See State v. John D. Joslin*, No. 03C01-9510-CR-00299, 1997 WL 583071, at *36 (Tenn. Crim. App. Sept. 22, 1997). Rule 405 states:

- 30 -

**(a) Reputation or Opinion.** In all cases in which evidence of character or a trait of character of a person is admissible, proof may be made by testimony as to reputation or by testimony in the form of an opinion. After application to the court, inquiry on cross-examination is allowable into relevant specific instances of conduct. The conditions which must be satisfied before allowing inquiry on cross-examination about specific instances of conduct are:

(1) The court upon request must hold a hearing outside the jury's presence,

(2) The court must determine that a reasonable factual basis exists for the inquiry, and

(3) The court must determine that the probative value of a specific instance of conduct on the character witness's credibility outweighs its prejudicial effect on substantive issues.

**(b) Specific Instances of Conduct.** In cases in which character or a trait of character of a person is an essential element of a charge, claim, or defense, proof may also be made of specific instances of that person's conduct.

Tenn. R. Evid. 405; *see* Tenn. R. Evid. 405 Advisory Comm'n Cmt. (noting that specific instances under subsection (b) must be an essential element of a cause of action or defense, e.g., whether "the defendant who called a defamed plaintiff a 'crook' can prove the plaintiff embezzled funds").

"When a defendant relies on a theory of self-defense and that the alleged victim of a violence crime was the first aggressor, the defense may present evidence of the victim's prior history of violent conduct." *State v. Eddie Smith*, No. W2018-01509-CCA-R3-CD, 2020 WL 3572071, at *11 (Tenn. Crim. App. June 30, 2020), *perm. app. denied* (Tenn. Dec. 3, 2020) (citing *State v. Ruane*, 912 S.W.2d 766, 781-82 (Tenn. Crim. App. 1995), *abrogated on other grounds by State v. Rogers*, 992 S.W.2d 393, 401 (Tenn. 1999)). Prior violent acts by the victim may be admissible as substantive evidence of the defendant's state of mind if the defendant was aware of them, or if the defendant was unaware of them, they may be admissible for the limited purpose of corroborating a self-defense claim that the victim was the first aggressor. *John D. Joslin*, 1997 WL 583071, at *36. Evidence which is admitted solely to corroborate other evidence that the victim was the first aggressor does not fall under Rule 404(a)(2) or 405. *State v. Chancy Jones*, No. W2010-02424-CCA-R3-CD, 2012 WL 1143583, at *7 (Tenn. Crim. App. Apr. 5, 2012). Because the Defendant was unaware of the prior assault, the evidence here was purely corroborative of the Defendant's testimony that the homicide victim jumped onto him.

Before corroborating evidence regarding the victim being the first aggressor may be introduced, there must be some evidence raising the issue that the victim was the first aggressor. *Eddie Smith*, 2020 WL 3572071, at *11. Prerequisites to the admission of prior violent acts by the victim are that:

> (1) the issue of self-defense must be raised by the proof and not simply by statements of counsel; (2) there must be a factual basis underlying the defendant's claim that the victim had first aggressor tendencies; and (3) the trial court must determine whether the probative value of the evidence is outweighed by the danger of unfair prejudice.

*Id.* at *12.

Here, the trial court admitted the evidence of the assault to corroborate the Defendant's testimony that the homicide victim jumped on him. *See Eddie Smith*, 2020 WL 3572071, at *12. Regarding the taking of property, Mr. Ramos testified that his wallet fell out and that the homicide victim grabbed it and ran, while Ms. Khan testified that it was possible that she took Mr. Ramos's wallet or that it fell out and that she subsequently handed it to the homicide victim. The trial court noted that it was "not sure it was established by clear and convincing evidence, what happened," and it ruled that it would only consider the evidence regarding the assault. The trial court did not err in excluding the evidence of the robbery under Tennessee Code Annotated section 24-7-125, which requires proof of the other crime, wrong, or act to be clear and convincing. T.C.A. § 24-7-125(3).

Furthermore, the trial court also properly excluded it as relevant to whether the homicide victim was the first aggressor. In *Eddie Smith*, the defense sought to introduce the prior convictions of the victim for aggravated robbery, aggravated burglary, and vandalism. *Eddie Smith*, 2020 WL 3572071, at *12. This court concluded that certified convictions were not sufficient to show that the victim had first aggressor tendencies because the documents established only the fact of the conviction, and it was possible that the victim had committed violent acts without being the first aggressor. *Id.* On the other hand, this court in *Eddie Smith* concluded that testimony regarding the facts underlying a domestic assault charge was sufficient to make the evidence admissible because the testimony established the victim's aggression. *Id.* at *13. This court noted that "'the trial court must determine the underlying facts of the alleged act of aggression.'" *Id.* at *12 (quoting *State v. Laterral Jolly*, No. 02C01-9207-CR-00169, 1993 WL 523590, at *4 (Tenn. Crim. App. Dec. 15, 1993)); *see Chancy Jones*, 2012 WL 1143583, at *7 (orders of protection were not relevant to the claim that the victim was the first aggressor when there was no evidence of the underlying factual basis of the orders). Here, the trial court determined that the act of aggression related to tackling had taken

- 32 -

place and would be admissible. There was conflicting evidence regarding the circumstances surrounding the taking of property and whether the taking involved force, and the court determined that the evidence regarding the taking of the wallet would not be admissible. We conclude that the court did not abuse its discretion in excluding the evidence because the court found that the facts surrounding the taking were not adequately established.

### B. Exclusion of Mr. Richardson's testimony regarding Ms. Haslam

The Defendant argues that the trial court erred in excluding the testimony of Mr. Juston Richardson regarding Ms. Haslam's participation in a robbery committed against him in 2019. The State responds that the evidence was properly excluded as propensity evidence. We agree that the evidence was offered for propensity and that did not meet the requirements for admission to corroborate that Ms. Haslam was the first aggressor.

The Defendant sought to introduce Mr. Richardson's testimony to support his theory that Ms. Haslam left with her children because she had conspired with the homicide victim and Mr. Reid to rob the Defendant. While the defense noted that Ms. Haslam was not in the room initially and that the evidence did not fit with first aggressor evidence, the defense also argued that the evidence should be admissible as "evidence of a pertinent character trait." Tenn. R. Evid. 404(a)(1), (2). The court asked, "You're arguing that this goes to her character for what?" Defense counsel replied, "Committing aggravated robberies." The State objected that the evidence was being impermissibly offered for propensity, and the defense responded that it would be admissible under 404(b) as a common scheme or plan. The trial court noted that there was nothing about the aggravated robbery that would make it admissible as a common scheme or plan, and that the Defendant had not articulated a non-propensity rationale to admit the evidence under 404(a). The Defendant agreed he was "changing [his] argument" to proceeding under 404(b). The following day, the trial court observed that it had sent the parties an email regarding the law on common scheme or plan, and the defense agreed that the evidence was not admissible under *State v. Moore*, but stated that it wanted to offer the evidence under a different theory. *See State v. Moore*, 6 S.W.3d 235, 240 (Tenn. 1999) (noting that common scheme or plan may be a "signature" crime, an offense that is part of a larger, continuing plan or conspiracy, or offenses that are part of the same criminal transaction); *State v. Robert E. Huse*, No. M2019-02087-CCA-R3-CD, 2021 WL 1100758, at *18 (Tenn. Crim. App. Mar. 23, 2021), *no perm. app. filed*. The defense requested to make a proffer of Mr. Richardson's testimony under the theory that Ms. Haslam, Mr. Reid, and the homicide victim conspired to rob the Defendant.

The trial court noted that there was no evidence in the record to show that Ms. Haslam was the first aggressor toward the Defendant. The court observed that, on the

contrary, her testimony indicated she left around 3:00 a.m., and her telephone records corroborated numerous contacts with the homicide victim's telephone between this time and the shooting. The Defendant's own testimony established that he had no plan to meet the homicide victim until he spontaneously called the homicide victim at 5:18 a.m. Ms. Haslam, Mr. Reid, and the Defendant all testified that Ms. Haslam did not enter the room until after the Defendant was holding the others at gunpoint, and Ms. Haslam and Mr. Reid both testified that they were entirely unacquainted.

The trial court ruled that the issue of first aggressor was not fairly raised with respect to Ms. Haslam but permitted the defense to make an offer of proof. Mr. Richardson testified that in June 2019, he was the victim of an aggravated robbery in which Ms. Haslam was a defendant. While the events are not clear from the testimony of Mr. Richardson, who was reluctant to testify, Mr. Richardson stated that Ms. Haslam's boyfriend held him at gunpoint, that another man who was with Ms. Haslam came to the driver's side door and stabbed him, that a camera from an ATM captured footage of Ms. Haslam running away with her boyfriend's gun, and that police found "a clip with a bunch of bullets" in the car in which Ms. Haslam eventually fled. After Mr. Richardson's testimony, the defense clarified that it was seeking to admit the evidence under a common scheme or plan showing a "distinctive design" pursuant to Rule 404(b). The court noted that there was no evidence that Ms. Haslam was involved in planning a robbery against the Defendant and that there was in any case no distinctive design in the offenses. *See State v. Jones*, 450 S.W.3d 866, 895 (Tenn. 2014).

On appeal, the Defendant argues that the evidence is admissible "to show that Ms. Haslam was no stranger to robberies being committed by her boyfriends." As noted above, the word "person" in Rule 404(b) has been construed to refer solely to the defendant in a criminal prosecution." Tenn. R. Evid. 404(b), 2005 Advisory Comm'n Cmt. (citing *Stevens*, 78 S.W.3d at 837). However, the analogous statutory provision, Tennessee Code Annotated section 24-7-125, "appl[ies] Rule 404(b) standards" to other witnesses. *State v. Reynolds*, 635 S.W.3d 893, 921 n.23 (Tenn. 2021); *see William Eugene Moon*, 2022 WL 1160781, at *7. Under Tennessee Code Annotated section 24-7-125, propensity evidence of prior bad acts is inadmissible. Such evidence may be admissible if the court determines "that a material issue exists other than conduct conforming with a character trait." T.C.A. § 24-7-125(2). The Defendant's argument falls squarely within the realm of propensity evidence—that is, he seeks to show that Ms. Haslam may have been involved in a robbery in 2016 because she was subsequently involved in a robbery in 2019. *See* T.C.A. § 24-7-125(2); *State v. Rodriguez*, 254 S.W.3d 361, 375-76 (Tenn. 2008). Insofar as the Defendant renews his argument at trial that the evidence is admissible for the purpose of showing a common scheme or plan, we conclude that the trial court properly excluded the evidence because identity was not a material issue and because the offenses were not of a distinctive design, part of a larger,

continuing plan or conspiracy, or part of the same criminal transaction. *See Moore*, 6 S.W.3d at 239-41 (concluding that the evidence was not admissible when identity was not at issue and the crimes did not display "'such unusual particularities' as to indicate the presence of a distinct modus operandi, nor were the offenses so 'strikingly' similar that they may be regarded as the stamp or signature of the appellant").

In his reply brief, the Defendant argues that the robbery should have been admissible not as propensity evidence but as evidence of first aggressor relevant to self-defense. However, the trial court did not err in concluding the evidence was not admissible on the issue of first aggressor. Here, the trial court found that there was simply no evidence that the Defendant was acting in self-defense against Ms. Haslam or that she was the first aggressor, because all the evidence established that she left the hotel room hours before the Defendant initiated contact with the homicide victim and because she only entered the room for seventeen seconds, during which time the testimony of all witnesses, including the Defendant, agreed that all the occupants of the room were being held at gunpoint by the Defendant. *Eddie Smith*, 2020 WL 3572071, at *12 (stating that prior to the admission of corroborating evidence of the victim as the first aggressor, "the issue of self-defense must be raised by the proof and not simply by statements of counsel"). Accordingly, the trial court did not abuse its discretion by excluding the evidence as relevant to the issue of Ms. Haslam being the first aggressor.

The Defendant also cites to Tennessee Rule of Evidence 608 as a basis for admitting the testimony. However, the Defendant did not argue that the evidence was admissible on this basis in the trial court, and the issue is accordingly waived. *See* Tenn. R. App. P. 36(a); *State v. Howard*, 504 S.W.3d 260, 277 (Tenn. 2016) ("It is well-settled that a defendant may not advocate a different or novel position on appeal."). The Defendant is not entitled to relief.

**C. Admission of Affidavit of Indigency and Evidence Regarding Child Support**

The Defendant challenges the trial court's decision to admit evidence regarding the Defendant's child support obligations and the affidavit he completed regarding child support, arguing that he was not given proper notice under Tennessee Rule of Evidence 608(b)(3). We agree with the State that the argument raised on appeal is waived because the defense objected only to relevance at trial.

At trial, the Defendant introduced evidence tending to negate a financial motive for the crime by testifying that he was employed and that his brother the football player would give him money as he needed it. On cross-examination, he testified he was employed "off and on" at a hotel in 2018. The prosecutor questioned the Defendant about a judgment for back child support that was first assessed against him in 2016, prior

to the homicide, and the Defendant stated he asked his brother for part of the money but not the entire judgment, explaining that he did not feel he should owe any money because he had custody of the child "most of the time." The prosecutor asked if he had lied on his 2018 uniform affidavit of indigency, and the Defendant denied having been untruthful. The prosecutor asked the Defendant to identify the affidavit, and defense counsel objected based on relevance. The court ruled that the affidavit was relevant to the Defendant's credibility. The Defendant then agreed he listed zero income or assets at the time he filled out the affidavit in December 2018 and that this was a lie.

Tennessee Rule of Evidence 608 provides:

> **(b) Specific Instances of Conduct.** Specific instances of conduct of a witness for the purpose of attacking or supporting the witness's character for truthfulness, other than convictions of crime as provided in Rule 609, may not be proved by extrinsic evidence. They may, however, if probative of truthfulness or untruthfulness and under the following conditions, be inquired into on cross-examination of the witness concerning the witness's character for truthfulness or untruthfulness or concerning the character for truthfulness or untruthfulness of another witness as to which the character witness being cross-examined has testified. The conditions which must be satisfied before allowing inquiry on cross-examination about such conduct probative solely of truthfulness or untruthfulness are:

> (1) The court upon request must hold a hearing outside the jury's presence and must determine that the alleged conduct has probative value and that a reasonable factual basis exists for the inquiry;

> (2) The conduct must have occurred no more than ten years before commencement of the action or prosecution, but evidence of a specific instance of conduct not qualifying under this paragraph (2) is admissible if the proponent gives to the adverse party sufficient advance notice of intent to use such evidence to provide the adverse party with a fair opportunity to contest the use of such evidence and the court determines in the interests of justice that the probative value of that evidence, supported by specific facts and circumstances, substantially outweighs its prejudicial effect; and

> (3) If the witness to be impeached is the accused in a criminal prosecution, the State must give the accused reasonable written notice of the impeaching conduct before trial, and the court upon request must determine that the conduct's probative value on credibility outweighs its unfair prejudicial effect on the substantive issues. The court may rule on

- 36 -

the admissibility of such proof prior to the trial but in any event shall rule prior to the testimony of the accused. If the court makes a final determination that such proof is admissible for impeachment purposes, the accused need not actually testify at the trial to later challenge the propriety of the determination.

Tenn. R. Evid. 608(b).

The Defendant objects that the affidavit and testimony were improperly admitted due to a lack of notice under Rule 608(b)(3). However, we agree with the State that this issue is waived. The Defendant objected only to relevance at trial, and the motion for a new trial asserted only generally that there was error in the admission of the evidence. *See* Tenn. R. App. P. 36(a); *Howard*, 504 S.W.3d at 277. The Defendant also renews his objection to the evidence based on relevance. However, cross-examination regarding the Defendant's 2016 child support obligation was relevant to rebut the Defendant's prior testimony that he was financially solvent and therefore had no motivation to commit a robbery. Cross-examination regarding untruthfulness on the affidavit was relevant to credibility. We conclude that there was no abuse of discretion.

### D. Admission of the Homicide Victim's Statement to Mr. Reid

The Defendant asserts that the homicide victim's statement to Mr. Reid regarding his reason for returning to the Super 8 was inadmissible hearsay. The State argues that the testimony was not hearsay because it was not offered for the truth of the matter asserted. Because the trial court clearly stated that it would not consider the evidence for the truth of the matter asserted, the evidence was properly admitted.

A trial court's factual findings and credibility determinations regarding a ruling on hearsay are binding on the appellate court unless the evidence preponderates against them. *Kendrick v. State*, 454 S.W.3d 450, 479 (Tenn. 2015). This court determines de novo whether a statement qualifies as hearsay or is admissible under one of the hearsay exceptions. *Id.* Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). Hearsay is generally not admissible. Tenn. R. Evid. 802.

At trial, Mr. Reid testified that he and the homicide victim left the Knights Inn and went to the homicide victim's room at the Super 8. The prosecution asked Mr. Reid if he knew why they were going to the Super 8, and Mr. Reid replied, "Well, when he told me what we were going there for, yes." The trial court sustained a hearsay objection. The

State then argued that the homicide victim's statement to Mr. Reid was not being offered for the truth of the matter asserted but "what Mr. Reid understood was happening at that time and why he's going to the hotel room." The court allowed it for that limited purpose, and Mr. Reid testified that the homicide victim "said that he was going to meet one of his friends that, apparently, they had some clothes or something that he was supposed to look at or whatever the case was." The Defendant argues that this statement was admitted for the truth of the matter asserted, that the two were going to the room for "an innocent purpose." The State argues that the statement was offered for the effect on the listener, Mr. Reid.

"A statement introduced for its effect on the listener is not hearsay." *State v. Eddie Harris*, No. W2017-01706-CCA-R3-CD, 2018 WL 6012620, at *9 (Tenn. Crim. App. Nov. 15, 2018) (citing *State v. Venable*, 606 S.W.2d 298, 301 (Tenn. Crim. App. 1980); Neil P. Cohen et al., *Tennessee Law of Evidence* §8.01, at 8-23 (5th ed. 2005)); *see, e.g., State v. Hawkins*, 519 S.W.3d 1, 42 (Tenn. 2017) (concluding that the victim's statement that she would contact the police was not hearsay when offered to show the defendant's motive to harm her). Here, the statement was not offered to show that the homicide victim was planning to meet the Defendant for the purpose of looking at clothing. *See, e.g.,* Tenn. R. Evid. Rule 803(3) (providing a hearsay exception for "statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health)"); *State v. Robinson*, 239 S.W.3d 211, 223 (Tenn. Crim. App. 2006) (concluding that the victim's hearsay statement that he planned to meet a man at a particular location for a rendezvous with a girl was admissible under Rule 803(3) to prove conduct in conformity with the plan). Instead, the State offered the statement to show that, regardless of whether the homicide victim and Defendant had any actual arrangement about clothing, Mr. Reid was induced, after hearing the statement, to accompany the homicide victim to the Super 8. The trial court explicitly stated that it would only consider the evidence for this limited purpose. Accordingly, the testimony was properly admitted for a non-hearsay purpose.

### E. Cross Examination Regarding Prior Felonies

The Defendant asserts that "the trial court erred in allowing the state to impeach [the Defendant with] his prior felony convictions." The State responds that the evidence was properly admitted as impeachment, as proof of intent, and because the Defendant opened the door to it. We conclude that the trial court did not err in admitting the convictions under Tennessee Rule of Evidence 404(b).

Prior to the Defendant's testifying, the State had filed a notice of intent to use as impeachment the Defendant's prior felony convictions in Florida for aggravated fleeing

and possession of a controlled substance. It subsequently filed an amended motion in which it also sought to use an underlying arrest report showing that the Defendant was initially charged with aggravated robbery instead of aggravated fleeing, attaching the convictions and arrest report. The State argued that the convictions should be admissible for impeachment, were relevant to the self-defense issue on which the court had not yet ruled, and were relevant to the first aggressor testimony which the defense sought to introduce. The trial court ruled that the convictions were too old to be admissible for impeachment under Tennessee Rule of Evidence 609 but did not make a ruling regarding admissibility for other purposes.

Under Tennessee Rule of Evidence 609(b), "Evidence of a conviction … is not admissible if a period of more than ten years has elapsed between the date of release from confinement and commencement of the action or prosecution," unless certain conditions are met and the court finds that the probative value of the evidence substantially outweighs its prejudicial effect. Tenn. R. Evid. 609(b). The trial court properly found that the convictions, which occurred in 2002 and 2004, were stale, and it declined to admit them for general impeachment purposes. Insofar as the Defendant asserts the convictions were admitted for impeachment, he is mistaken.

At trial, the prosecutor questioned the Defendant about putting the gun in his pocket, asking him, "[Y]ou know that you're not allowed to have a gun, right?" The Defendant responded, "No, I actually didn't think I had [any] felonies. I thought I beat my felonies." Defense counsel objected, and the prosecutor argued that the evidence was relevant to the Defendant's credibility and "whether or not he knew that he is committing a crime when he takes this gun." The trial court determined that the testimony was admissible not for impeachment "but for the purpose of whether or not—what knowledge he had," clarifying that it found the proof relevant to guilty knowledge under Rule 404(b). The Defendant then testified that he did not at the time think he was breaking the law by taking the gun, but he agreed he did have two felony convictions.

Under Tennessee Rule of Evidence 404(b), evidence of other crimes is not admissible for propensity, but may be admissible for other purposes. Prior to admitting the evidence,

(1) The court upon request must hold a hearing outside the jury's presence;
(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;
(3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

(4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b).

In this case, the convictions were not introduced as impeachment under Rule 609 but as evidence of other crimes under Rule 404(b). While the trial court heard the parties on the issue during the bench trial and determined that the evidence was relevant to a material issue other than propensity, it did not explicitly state that the convictions were shown by clear and convincing evidence or explicitly weigh the prejudicial and probative value. When the trial court fails to substantially comply with the procedural requirements of Rule 404(b) but the record is sufficient to make a determination regarding admissibility, the reviewing court determines the admissibility of the evidence de novo. *State v. Sexton*, 368 S.W.3d 371, 402 (Tenn. 2012), *as corrected* (Tenn. Oct. 10, 2012); *State v. DuBose*, 953 S.W.2d 649, 653 (Tenn. 1997).

Here, the crimes were established by clear and convincing evidence because the State attached to its motion and later introduced certified copies of the Defendant's prior convictions, and the Defendant did not contest that he had two felony convictions. Under Rule 404(b), evidence of other crimes is not admissible to show a defendant's proclivity for criminal activity, but it may be admissible if it bears on a material issue, such as "identity (including motive and common scheme or plan), intent, or rebuttal of accident or mistake." Tenn. R. Evid. 404, Advisory Comm'n Cmt. Courts have also concluded that evidence is admissible on the material issues of guilty knowledge, completion of the story, opportunity, and preparation. *State v. Jones*, 568 S.W.3d 101, 132 (Tenn. 2019). The State's theory at trial was that the Defendant arranged a drug transaction and armed himself because he intended to commit a robbery during the transaction. The trial court determined that the prior convictions were relevant to guilty knowledge regarding the Defendant's decision to carry a gun. The Defendant's decision to arm himself despite an awareness that he was prohibited from carrying a weapon was probative of his preparation for and of his intent to commit a robbery (an offense of which he was ultimately acquitted). It was also relevant to the material issue of whether the Defendant was engaged in unlawful activity, triggering a duty to retreat.[4] *See State v. Perrier*, 536 S.W.3d 388, 404 (Tenn. 2017) (holding that "the defendant's possession of a firearm when he was a convicted felon … is encompassed within 'unlawful activity'"). The prejudicial value of the evidence in a bench trial was extremely minimal because the trial court was already aware of the existence of the convictions and because the court stated it would only consider the evidence as relevant to issues other than propensity. We conclude that the trial court did not err in admitting the evidence.

---

[4] The Defendant's nexus argument is addressed infra.

## III. Self-Defense and Duty to Retreat

The Defendant asserts that the trial court erred in refusing to consider self-defense regarding the homicide, arguing that the issue was fairly raised by the evidence. He also asserts that, although the trial court considered self-defense regarding the offense against Mr. Reid, it erred in its determination that the Defendant had a duty to retreat. We conclude that the court properly determined that self-defense was not fairly raised as to the homicide victim and that the Defendant had a duty to retreat.

The trial court ruled that it would consider self-defense as it applied to the offense committed against Mr. Reid, and the Defendant does not challenge this determination. Instead, the Defendant challenges the trial court's refusal to consider self-defense as to the homicide. The statute governing self-defense states:

> (b)(1) Notwithstanding § 39-17-1322, a person who is not engaged in unlawful activity and is in a place where the person has a right to be has no duty to retreat before threatening or using force against another person when and to the degree the person reasonably believes the force is immediately necessary to protect against the other's use or attempted use of unlawful force.
> (2) Notwithstanding § 39-17-1322, a person who is not engaged in unlawful activity and is in a place where the person has a right to be has no duty to retreat before threatening or using force intended or likely to cause death or serious bodily injury, if:
> (A) The person has a reasonable belief that there is an imminent danger of death or serious bodily injury;
> (B) The danger creating the belief of imminent death or serious bodily injury is real, or honestly believed to be real at the time; and
> (C) The belief of danger is founded upon reasonable grounds.

T.C.A. § 39-11-611(b)(1) (2016); *see State v. Benson*, 600 S.W.3d 896, 906 (Tenn. 2020), *cert. denied*, 141 S. Ct. 427 (2020) (noting that "[t]he bar is substantially higher for one trying to fairly raise the issue of the valid use of deadly force").

The Defendant testified that Mr. Reid grabbed his shoulder and jacket from behind and that he responded by striking Mr. Reid with the weapon in his pocket and holding him at gunpoint, and the trial court determined that self-defense had been fairly raised as to the offense charged with Mr. Reid as the victim. The trial court found that self-defense was not fairly raised regarding the homicide because the Defendant had presented no evidence that the homicide victim used force against him and had testified to no objective reason to impute Mr. Reid's assault to the homicide victim. It further found that any

belief the Defendant held that he was being robbed was not reasonable. The court later made findings that the Defendant struck Mr. Reid first, that the Defendant failed to retreat, and that the Defendant's response was "far greater than necessary to avoid death or serious bodily injury." In imposing the conviction, the trial court noted that it had rejected the Defendant's version of events in favor of Mr. Reid's testimony that the Defendant struck him without provocation, and the court elaborated later that it also found that the Defendant had had the opportunity to retreat but had not availed himself of it and that his use of force had been beyond that reasonably necessary.

## A. Self-Defense

The Defendant asserts that the court erred in determining that the issue of self-defense was not fairly raised as to the homicide victim. "The quantum of proof necessary to fairly raise a general defense is less than that required to establish a proposition by a preponderance of the evidence." *State v. Hawkins*, 406 S.W.3d 121, 129 (Tenn. 2013). To determine if a defense has been fairly raised, the court looks at the evidence in the light most favorable to the defense, including all reasonable inferences drawn in the defendant's favor. *Benson*, 600 S.W.3d at 903. "If a general defense is found to be fairly raised by the proof, the trial court must submit the defense to the jury and the burden shifts to the prosecution to prove beyond a reasonable doubt that the defense does not apply." *Id.*

We conclude that the trial court did not err in determining that self-defense was not fairly raised as to the homicide victim. Because the gunshots deployed against the homicide victim were "force intended or likely to cause death or serious bodily injury," the Defendant had to present evidence fairly raising the inference that he had a reasonable belief that he stood in imminent danger of death or serious bodily injury. *See* T.C.A. § 39-11-611(b)(2) (2016); *Benson*, 600 S.W.3d at 906 (noting that the defendant's statement did not "fairly raise the issue that he feared imminent death or serious bodily injury" after receiving a punch to the nose). While the Defendant's testimony created a factual issue regarding whether or not Mr. Reid assaulted him first by grabbing his jacket or shoulder, nothing in his testimony demonstrated that he had a reasonable belief that he was in danger of death or serious bodily injury under subsection (b)(2). The Defendant's own account of the encounter was that Mr. Reid grabbed him and that he then struck Mr. Reid with the weapon in self-defense. According to the Defendant, he then proceeded to hold Mr. Reid and the homicide victim at gunpoint while the homicide victim demonstrated that he was unarmed by spontaneously disrobing. At no point did either Mr. Reid or the homicide victim make a verbal threat to the Defendant or attempt to employ force putting him in danger of death or serious bodily injury. While the Defendant makes much of the fact that his necklace was found in the homicide victim's hand, he presented no evidence that he had a reasonable fear of imminent death or serious

bodily injury, and we note there was also an absence of proof that the homicide victim and Mr. Reid demanded his property or tried to rob him. "At most, the defense proof fairly raised the issue of whether the defendant was justified in using *non-lethal* force to protect himself" from Mr. Reid. *Benson*, 600 S.W.3d at 907. The trial court properly determined that self-defense was not fairly raised regarding the Defendant's shooting of the homicide victim because there was nothing from which it could be inferred that the Defendant reasonably feared death or serious bodily injury.

Furthermore, self-defense is not available when the defendant "provoked the other individual's use or attempted use of unlawful force," unless the defendant abandoned the encounter and communicated the abandonment. T.C.A. § 39-11-611(e)(2). Insofar as the Defendant argues that the homicide victim's jumping on his back led to a reasonable belief that he was in imminent danger of death or serious bodily injury, the Defendant's own testimony was that the homicide victim jumped on the Defendant's back only after the Defendant pointed a weapon at the homicide victim's girlfriend, Ms. Haslam. Accordingly, the Defendant's own testimony established that the homicide victim's use of force was provoked by the Defendant's act of aiming the gun at Ms. Haslam. The trial court did not err in determining that self-defense was not fairly raised in regard to the homicide offense. In addition, the trial court made a factual finding during the bench trial that the confrontation began with the Defendant striking Mr. Reid without provocation. The Defendant is not entitled to relief.

### B. Duty to Retreat

The Defendant objects to the trial court's determination that the Defendant had a duty to retreat prior to using force. In applying the statutory law of self-defense, a trial court must make a threshold determination regarding whether the defendant has a duty to retreat, deciding "whether the State has produced clear and convincing evidence that the defendant was engaged in unlawful activity such that the 'no duty to retreat' instruction would not apply," using the procedures in Tennessee Rule of Evidence 404(b). *Perrier*, 536 S.W.3d at 403. The Defendant, citing *Perrier*, argues that his unlawful act of being a felon in possession of a weapon was unrelated to the confrontation, that the holding in *Perrier* is "non[]sensical," and that the duty to retreat should only apply if the Defendant's involvement in an illegal act had some sort of nexus to the perceived threat. In *Perrier*, the Tennessee Supreme Court held that the defendant's possession of a firearm as a convicted felon "is encompassed within 'unlawful activity'" under the self-defense statute, but it pretermitted the nexus argument because the error in allowing the jury to determine the threshold question of a duty to retreat was harmless beyond a reasonable doubt. *Id.* at 404-05. Any argument that the possession of a weapon by a

felon does not constitute "unlawful activity" under the statute is misplaced in this court, which is bound by the holdings of the Tennessee Supreme Court.[5]

Although *Perrier* declined to determine the nexus requirement, this court has subsequently addressed the issue. In *State v. Tyshon Booker*, this court concluded "that a causal nexus between a defendant's unlawful activity and his or her need to engage in self-defense is necessary before the trial court can instruct the jury that the defendant had a duty to retreat." No. E2018-01439-CCA-R3-CD, 2020 WL 1697367, at *27 (Tenn. Crim. App. Apr. 8, 2020), *perm. app. granted* (Tenn. Sept. 16, 2020) (granting appeal "solely as to the issue of whether the sentence of life imprisonment violates the United States or Tennessee Constitutions"). The court determined that the juvenile offender's "status offense[]" of being a juvenile in possession of a handgun did not invoke a duty to retreat because rarely could "a person's status alone … provoke, cause, or produce" a confrontation. *Id.* (concluding that the defendant had a duty to retreat not based on the status offense but based on evidence that the defendant was engaged in robbing the victim). In *State v. Yancey Lee Williams II*, this court applied a nexus requirement and determined that the defendant's unlawful conduct of selling drugs was causally related to the shooting when the shooting resulted in part over allegations of underpayment for the drugs. No. M2019-00091-CCA-R3-CD, 2020 WL 4345504, at *15 (Tenn. Crim. App. July 29, 2020), *no perm. app. filed*; *see also State v. Shannon Bruce Foster*, No. E2020-00304-CCA-R3-CD, 2021 WL 3087278, at *24 (Tenn. Crim. App. July 22, 2021) (concluding that the defendant's act of possessing a handgun with the intent to go armed had a causal relationship to the shooting when the defendant brought the gun to the victim's house after the victim assaulted the defendant's mother), *perm. app. denied* (Tenn. Dec. 8, 2021).

Here, the State presented clear and convincing evidence, including the Defendant's own testimony, that the assault on Mr. Reid occurred while the Defendant was engaged in a drug transaction. *See Perrier*, 536 S.W.3d at 403 (requiring clear and convincing evidence that the defendant was engaged in unlawful conduct). The unlawful activity was causally linked to the confrontation, and we conclude that the trial court did not err in determining that the Defendant had a duty to retreat prior to using any force against Mr. Reid. In any event, because the trial court rejected the Defendant's theory that Mr. Reid attacked him and instead credited Mr. Reid's testimony that the Defendant struck Mr. Reid without provocation, any error would be harmless. *See* Tenn. R. App. P. 36(b).

---

[5] We note that the statute has been amended by deleting the language regarding "not engaged in unlawful activity" and substituting "not engaged in conduct that would constitute a felony or Class A misdemeanor." 2021 Tenn. Pub. Laws ch.115, section 3.

## IV. Election

The Defendant asserts that the trial court erred when it did not require the State to elect between the attempted and completed predicate felonies for the felony murder counts, to elect the victim of the predicate felonies in the felony murder counts charging underlying felonies of aggravated robbery, attempted first degree murder, and aggravated kidnapping, or to elect the item taken during the robbery of the homicide victim. We conclude that the Defendant is not entitled to relief.

Generally, the right to a trial by jury guarantees that a verdict rests on the jurors' unanimous conclusion that the defendant committed one particular criminal act. *State v. Kendrick*, 38 S.W.3d 566, 568 (Tenn. 2001). The doctrine of election exists to eliminate the potential for a non-unanimous verdict where evidence of multiple criminal acts has been introduced. *State v. Qualls*, 482 S.W.3d 1, 9 (Tenn. 2016). "The election doctrine refers to the prosecutor's duty in a case where evidence of multiple separate incidents is introduced to elect for each count charged the specific incident on which the jury should deliberate to determine the defendant's guilt." *Id.* The doctrine likewise "assists the defendant in preparing for and defending against the specific charge, protects the defendant from double-jeopardy concerns, 'enables the trial judge to review the weight of evidence in its role as thirteenth juror[, and] enables an appellate court to review the legal sufficiency of the evidence.'" *Id.* at 10 (quoting *State v. Brown*, 992 S.W.2d 389, 391 (Tenn. 1999)); *see Kendrick*, 38 S.W.3d at 568. Whether an election is required is a question of law reviewed de novo. *Qualls*, 482 S.W.3d at 8.

In a bench trial, there is no possibility of the trier of fact rendering a non-unanimous verdict, and accordingly, the doctrine of election for the purpose of unanimity has no application. While the Defendant asserts he was forced into a bench trial because the trial court denied his motion to force the State to elect offenses prior to trial, the Defendant cites no legal authority for the proposition that the State must elect an offense prior to the close of its proof. *See id.* at 10 ("The election must be made at the conclusion of the State's case-in-chief."); *State v. Knowles*, 470 S.W.3d 416, 423 (Tenn. 2015) ("The State … must elect at the close of its case-in-chief the particular offense for which it is seeking a conviction.").

Insofar as the Defendant asserts he was entitled to election for a purpose other than unanimity, we conclude that he is not entitled to relief because any error would be harmless beyond a reasonable doubt due to the Defendant's acquittal of the charged offenses. The Defendant was acquitted of felony murder and aggravated robbery and instead convicted of the lesser included offenses of second degree murder and aggravated assault, for which the Defendant presents no election argument. *See Horace E. Hollis, Jr., v. State*, No. M2013-01509-CCA-R3-PC, 2017 WL 588204, at *10 (Tenn. Crim.

App. Feb. 14, 2017) (concluding that the petitioner was not entitled to relief when trial counsel did not force an election during the first trial charging offenses committed on a particular date, because the petitioner was acquitted of the offenses during that trial and convicted at the second trial of offenses committed on a different date); *see also Qualls*, 482 S.W.3d at 17 (errors in election are analyzed for constitutional harmless error). Accordingly, the Defendant is not entitled to relief.

## VI.  Double Jeopardy

The Defendant asserts that the trial court erred when, after announcing an acquittal on Count 3 charging felony murder in the commission of or attempt to commit first degree murder, it subsequently convicted him of the lesser included offense of second degree murder.  The State responds that the trial court properly corrected a verdict that had not become final.  We hold that the judgment of acquittal, which was entered into the minutes of the court after its adjournment, was final, and we conclude that the principles of double jeopardy prohibited the trial court from revisiting the acquittal, however erroneous it may have been.  Accordingly, the Defendant's conviction in Count 3 is reversed, and the judgment of acquittal is reinstated.

When the trial court announced its judgments, it noted that for the felony murder in the commission of attempted first degree murder, there was evidence that the Defendant threatened Ms. Haslam and that she heard a click from the gun.  However, the court found that the threat was merely an attempt to gain control of the room, noting that shooting Ms. Haslam would have jeopardized the Defendant's escape.  It found that the State had not established the predicate felony for that count.  The parties asked for clarification on the ruling on Count 3, and the court found that the State had not proven attempted first degree murder as the predicate felony beyond a reasonable doubt:

> As I said, while I thought there was evidence there to support it, I just — I can[]not reconcile it with the fact that he would be placing himself in a position where basically he was going to have to kill all three of them, and I just do not — there was nothing about [the Defendant] or the circumstances that suggest that he is a cold-blooded murderer.  He obviously murdered someone, but the circumstances were somewhat unusual.  And I just don't feel that, despite there being evidence of premeditation, I think it was a more of a bluster type thing to keep absolute control of her and keep her mouth shut rather than an expression of what he was going to actually end up doing.
>
> So, I ... Yeah.  So, I guess, it would have to be a not guilty, wouldn't it.  There wouldn't be — it wouldn't go to the second degree because it — I

mean, there wouldn't be a lesser included offense that it could go to that would fall under felony murder. Is there? So, anything else?

The parties then discussed the sentencing hearing. The record contains a minute entry showing the court's findings: "AFTER HAVING HEARD THE CONCLUSION OF TRIAL, THE COURT FINDS THE DEFENDANT GUILTY OF COUNTS ONE AND TWO SECOND DEGREE MURDER AND COUNTS FIVE AND SIX AGGRAVATED ASSAULT WITH A DEADLY WEAPON, BUT NOT GUILTY OF FELONY MURDER." The record shows that at the sentencing hearing, the prosecutor noted that there was a conviction on Count 3 not reflected in the presentence report because the court "had found him not guilty" on Count 3 and "clarified afterwards" that it found him guilty of the lesser included offense of second degree murder. The trial court confirmed that "I think we had already adjourned and I just sent that correction by e-mail or something, as I recall."[6]

On appeal, the Defendant argues that the court's adjournment was the equivalent of discharging a jury and that it had no authority to change its judgment. He cites *State v. Green*, arguing that once the trier of fact has been discharged, the imposition of a conviction is a violation of double jeopardy. *State v. Green*, 995 S.W.2d 591, 614 (Tenn. Crim. App. 1998). The State responds that the verdict was not final until sentencing. We conclude that, because the verdict was recorded in the minutes of the court after it adjourned, the acquittal was final, and we conclude that the trial court violated the prohibition against double jeopardy by subsequently altering the judgment.

In *Green*, the jury announced verdicts of "Not guilty" and left the courtroom via a congested public area. *Id.* at 607. The jury was reassembled within two minutes and clarified that it had found the defendant guilty of lesser included offenses. *Id.* at 608-09. This court, having concluded that the jury was discharged, held that reassembling the jury was a violation of double jeopardy and due process. *Id.* at 613-14. Accordingly, once the jury is discharged, its verdict cannot be amended or corrected. *See State v. Nash*, 294 S.W.3d 541, 553 (Tenn. 2009) (when the jury was discharged after first part of bifurcated trial without admonitions, the trial court was required to select a new jury for determination of the number of the defendant's prior offenses); *State v. Stephenson*, 878

---

[6] The Defendant attached to his brief the email from the trial judge regarding his decision to impose a conviction for second degree murder on Count 3, but this court cannot consider facts appended to the record except in specific circumstances not present here. Tenn. R. App. P. 13(c) (noting that this court "may consider those facts established by the evidence in the trial court and set forth in the record and any additional facts that may be judicially noticed or are considered pursuant to rule 14"); *State v. Bobadilla*, 181 S.W.3d 641, 643 (Tenn. 2005) ("What is in the record sets the boundaries for what the appellate courts may review, and thus only evidence contained therein can be considered."); *State v. Davidson*, 121 S.W.3d 600, 614 n.8 (Tenn. 2003) (noting that information attached to the defendant's brief "cannot be considered by this Court because it was not introduced as evidence in the trial court").

S.W.2d 530, 554 (Tenn. 1994) ("However, once a jury in a felony case has been discharged and outside contacts may have occurred, the jury may not be reconvened for the purpose of taking further action involving the accused."), *abrogated on other grounds by State v. Saylor*, 117 S.W.3d 239, 246 (Tenn. 2003).

In the case at bar, the judgment of acquittal was announced by the trial court after a bench trial rather than through a jury verdict. However, acquittal bars further prosecution for the same offense, whether the acquittal is through a bench trial or jury trial. *Smith v. Massachusetts*, 543 U.S. 462, 467 (2005); *United States v. Martin Linen Supply Co.*, 430 U.S. 564, 573 (1977). The United States Supreme Court has distinguished between substantive acquittals and procedural rulings, such as mistrials and dismissals. Procedural dismissals may terminate a case midtrial but "'are unrelated to factual guilt or innocence'" and instead embody "'a legal judgment that a defendant, although criminally culpable, may not be punished' because of some problem like an error with the indictment." *Evans v. Michigan*, 568 U.S. 313, 319 (2013) (quoting *United States v. Scott*, 437 U.S. 82, 98 and n.11 (1978)). Acquittals, on the other hand, "encompass any ruling that the prosecution's proof is insufficient to establish criminal liability for an offense," including a finding that the evidence is insufficient to establish the elements, a factual finding that necessarily establishes a lack of criminal culpability, and any other ruling related to the ultimate question of guilt or innocence. *Id.* at 318-19. An acquittal is "'a resolution, correct or not, of some or all of the factual elements of the offense charged.'" *Sanabria v. United States*, 437 U.S. 54, 71 (1978) (quoting *Lee v. United States*, 432 U.S. 23, 30 n.8 (1977)). "[A] judgment that the evidence is legally insufficient to sustain a guilty verdict constitutes an acquittal for purposes of the Double Jeopardy Clause." *Smalis v. Pennsylvania*, 476 U.S. 140, 142 (1986). While double jeopardy does not prohibit retrial when a case is dismissed on procedural grounds, "a merits-related ruling concludes proceedings absolutely," even when predicated on a "clear misunderstanding" of the law. *Evans*, 568 U.S. at 319, 320. The prohibition against double jeopardy is explicitly extended "to situations where an acquittal is 'based upon an egregiously erroneous foundation.'" *Sanabria*, 437 U.S. at 64 (quoting *Fong Foo v. United States*, 369 U.S. 141, 143 (1962)).

In *Evans*, the trial court, erroneously concluding that the statute under which the defendant was charged required the prosecution to prove that the building burned was not a dwelling, granted a directed verdict. *Evans*, 568 U.S. at 316-17. The United States Supreme Court rejected the argument that the directed verdict, because it was a result of an error of law rather than a finding of fact, fell outside the definition of an acquittal. *Id.* at 321. It noted that "[c]ulpability (*i.e.*, the 'ultimate question of guilt or innocence') is the touchstone, not whether any particular elements were resolved or whether the determination of nonculpability was legally correct." *Id.* at 324 (quoting *Scott*, 437 U.S. at 98 n.11). Because the acquittal resolved the question of guilt or innocence as a matter

of sufficiency, it precluded reprosecution. *Id.* at 324. Likewise, in *Sanabria*, the trial court entered an order excluding certain evidence and another order acquitting one defendant of the count charged against him. 437 U.S. at 66-67. The United States Supreme Court, concluding the trial court had made an erroneous evidentiary ruling leading to an acquittal based on sufficiency of the evidence, nevertheless held that the acquittal, "however erroneous," barred further review or prosecution. *Id.* at 69.

The State cites to *U.S. ex rel. Young v. Lane*, in which the trial court noted in its findings in a bench trial that the defendant was criminally responsible for the actions of a co-defendant and that the co-defendant was guilty of murder but concluded that the "most reasonable finding" was to convict the defendant of the offense of armed violence in a separate count. 768 F.2d 834, 836 (7th Cir. 1985). One month later, at sentencing, the court noted that the defendant could not be found guilty of the armed violence offense unless he was accountable for the underlying violent act, and it stated that it found the defendant guilty of murder but would not impose a sentence for that count. *Id.* at 836-37. The Seventh Circuit concluded that, under Illinois law, the judge's statement after the bench trial was "just musing out loud," and it held that there was no final judgment until the sentence was entered, and accordingly, no double jeopardy violation. *Id.* at 841-42. The Seventh Circuit noted particularly that the trial judge had stated "defendant *will be* found guilty of the included offense.... Perhaps we will take it up at sentenc[ing]" and that the state court had concluded there was no implicit acquittal on the charge. *Id.*; *see also State v. Gary J. Greer*, No. M1998-00789-CCA-R3-CD, 2000 WL 284180, at *5 (Tenn. Crim. App. Mar. 17, 2000) (noting that "'[t]here is no verdict, so long as there is any uncertainty or contingency as to the finality of the determination of the jury'" (quoting *Baldwin v. State*, 204 S.W.2d 1018, 1018 (Tenn. 1947))).

In general, while a final judgment of acquittal is unassailable, the finality of a judgment may be determined under state law. In *Smith v. Massachusetts*, the judge acquitted the defendant of a weapons charge after concluding that the prosecution had not established that the gun was less than sixteen inches. 543 U.S. at 465. The trial judge wrote on the motion that it was granted and entered the motion on the docket. *Id.* After discovering legal precedent that the barrel length could be inferred from the type of gun, the court reversed its ruling and sent the charge, with other counts, to the jury. *Id.* The United States Supreme Court noted that the trial court's ruling was not tentative and that there was "no reason to doubt the finality" of the ruling. *Id.* at 470. While observing that state law may dictate whether a mid-trial judgment of acquittal becomes final or can be reconsidered, the Supreme Court concluded that Massachusetts had not adopted any rule of nonfinality. *Id.* at 471 (noting that Massachusetts law permitted the correction of clerical errors at any time and permitted reconsideration of interlocutory rulings but did not support nonfinality of judgments of acquittal granted midtrial) (citing *Watson v. State*, 410 So. 2d 207, 209 (Fla. Dist. Ct. App. 1982) ("[A]t least until the hearing has come to

an end, the trial judge may reverse himself on a ruling on a motion for judgment of acquittal."); *State v. Collins*, 771 P.2d 350, 353 (Wash. 1989) (adhering to the rule "that a ruling is final only after it is signed by the trial judge in the journal entry or is issued in formal court orders")). While allowing for the possibility that an opportunity for reconsideration could be "plainly established by pre-existing rule or case authority expressly applicable to midtrial rulings on the sufficiency of the evidence," the court concluded that the "facially unqualified" mid-trial order of acquittal was indeed final and could not be revisited during trial by sending the count to the jury. *Smith*, 543 U.S. at 473 (noting that the defendant may have relied on the acquittal to his prejudice); *compare Price v. Vincent*, 538 U.S. 634, 637, 642 (2003) (the state court's finding that the directed verdict was not final was not an unreasonable determination of the facts or unreasonable application of federal law when, prior to the court's adjournment, the court agreed to hear further argument on the matter of the directed verdict on the following day but when the clerk made an entry on the docket sheet noting that the directed verdict was granted).

Accordingly, we turn to Tennessee law to determine the finality of the acquittal pronounced after the bench trial and the validity of the court's attempt to change it after adjournment. The State cites *Cantrell v. Easterling* for the proposition that "a judgment in a criminal case includes *both* a conviction *and* a sentence," and argues that the judgment was not entered until the sentencing hearing. *Cantrell v. Easterling*, 346 S.W.3d 445, 456 (Tenn. 2011). However, the State does not explain how a judgment of acquittal could include *either* a conviction or a sentence, and *Cantrell* clearly contemplates a judgment of conviction. *See id.* at 456 (noting that a judgment "of conviction" includes a plea, verdict or findings and adjudication and sentence); T.C.A. § 40-35-209(e)(1) (requiring completion of a uniform judgment document "for the conviction" after sentencing); Tenn. S. Ct. R. 17 (requiring a judgment form to be prepared "for each conviction"); T.C.A. § 40-20-101(a) ("After a verdict against the defendant, if the judgment is not arrested or a new trial granted, the court shall pronounce judgment.").

We interpret the State's argument to be that the judgment was not final until after sentencing on the other offenses of which the Defendant was convicted at the bench trial. While in general, a judgment becomes final thirty days after its entry unless a timely specified post-trial motion is filed, "[a] judgment of acquittal… is final upon entry." *State v. Thompson*, 285 S.W.3d 840, 852 (Tenn. 2009). In *Thompson*, the Tennessee Supreme Court quoted *Ball v. United States*, where the United States Supreme Court held that "'in this country a verdict of acquittal, although not followed by any judgment, is a bar to a subsequent prosecution for the same offense.'" *Id.* at 852 (quoting *Ball v. United States*, 163 U.S. 662, 671 (1896)); *see Smalis*, 476 U.S. at 145 (noting that "'[a]cquittals, unlike convictions, terminate the initial jeopardy'" (quoting *Justices of Boston Municipal Court v. Lydon*, 466 U.S. 294, 308 (1984)). Thus, an acquittal on one charge may become final

- 50 -

prior to final judgments being rendered in other charges. *Thompson*, 285 S.W.3d at 854 (holding that the verdict acquitting the defendant of attempted first degree murder in his first trial was final prior to retrial on a felony murder charge). "In the context of an acquittal, we note that as a practical matter, there is no need for a judgment for jeopardy to bar a retrial of the issue." *State v. Huskey*, 66 S.W.3d 905, 929 (Tenn. Crim. App. 2001). Although Tennessee Rule of Criminal Procedure 32 directs the entry of "a judgment" upon acquittal, *see* Tenn. R. Crim. P. 32(e)(3) ("If the defendant is found not guilty or for any other reason is entitled to be discharged, the court shall enter judgment accordingly."), "[a]cquittal is final and bars reprosecution although not followed by judgment." *State v. Todd*, 654 S.W.2d 379, 382 (Tenn. 1983). By rule, the uniform judgment document is required for convictions. T.C.A. § 40-35-209(e)(1); Tenn. S. Ct. R. 17.

The Tennessee Supreme Court has concluded that a minute entry reflecting acquittal in a jury trial was a final judgment of acquittal prohibiting retrial. In *State ex rel. Myers v. Brown*, the jury returned verdicts of guilt as to some co-defendants and a verdict of not guilty as to the defendant, and the court entered the judgment of acquittal regarding the defendant on the docket. 351 S.W.2d 385, 386-87 (Tenn. 1961). The jury had failed to impose sentences for the convictions and was ordered to deliberate further. *Id.* at 386. The following day, the jury stated that it was unable to reach a decision on sentencing and that it could no longer agree as to the guilt or innocence of any of the defendants, including the defendant who had been acquitted. *Id.* at 387. The court erased the judgment of acquittal and instead noted on the docket a mistrial as to the defendant. *Id.* The Tennessee Supreme Court, noting that if there had not been other defendants, the jury would have been discharged, concluded that "the verdict of the jury was complete" and that the defendant was entitled to be discharged "when [the verdict was] accepted by the court." *Id.* at 388. The Court held that the trial court's acceptance was indicated "by the trial judge by making bench notes on the docket to this effect" and that the jury had rendered a final, unanimous verdict and judgment should have been entered accordingly. *Id.* at 388-89 (citing a statutory provision analogous to T.C.A. § 40-18-113, requiring judgment to be entered as to those defendants in regard to whom the jury agrees if the jury cannot agree upon the verdict for all defendants).

In this case, as in *Brown* and *Smith*, a judgment of acquittal was granted, and the acquittal was indicated in the records of the court. *See Smith*, 543 U.S. at 465, 473 (double jeopardy prohibited submitting the charge to the jury when the trial court entered a facially unqualified acquittal on the docket midtrial); *Brown*, 351 S.W.2d at 388 (the trial judge's act of accepting the jury's acquittal by making bench notes on the docket barred retrial). The trial court stated on the record that it believed the correct resolution of Count 3 was an acquittal, and the State did not object that the court should consider a lesser included offense. There was nothing to indicate that the matter was taken under

advisement or was otherwise not a final determination. *Compare Vincent*, 538 U.S. at 642-43 (giving deference to the state court's finding that "the trial judge's comments were not sufficiently final to terminate jeopardy"). Instead, a minute entry indicates that the Defendant, having been convicted of two counts of second degree murder and two counts of aggravated assault, was found "NOT GUILTY OF FELONY MURDER" in the remaining count. Court was adjourned. We conclude that the judgment of acquittal was final, whether or not it was erroneous. *See Brown*, 351 S.W.2d at 388; *Smith*, 543 U.S. at 465, 473; *see Sanabria*, 437 U.S. at 64. The principles of double jeopardy prohibited the trial judge from revisiting this determination, and accordingly, the Defendant's conviction in Count 3 is reversed and the judgment of acquittal reinstated. We remand for entry of a judgment form reflecting acquittal.

## VII. Sentencing

The Defendant contests the trial court's sentencing, in particular objecting to the trial court's application of the enhancement and mitigating factors. The State concedes that one enhancement factor was incorrectly applied but asserts that the trial court did not abuse its discretion in imposing the sentences. We agree that the trial court's sentences, which were within the applicable range and imposed in compliance with the purposes and principles of sentencing, did not constitute an abuse of discretion.

A trial court's sentencing decisions are generally reviewed for abuse of discretion, with a presumption of reasonableness granted to within-range sentences that reflect a proper application of the purposes and principles of sentencing. *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). A trial court abuses its discretion when it applies an incorrect legal standard, reaches an illogical conclusion, bases its decision on a clearly erroneous assessment of the evidence, or employs reasoning that causes an injustice to the party complaining. *State v. Herron*, 461 S.W.3d 890, 904 (Tenn. 2015). The court will uphold the sentence "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Bise*, 380 S.W.3d at 709-10. This court cannot reverse a sentence based on the trial court's failure to adjust a sentence in "light of applicable, but merely advisory, mitigating or enhancement factors." *State v. Carter*, 254 S.W.3d 335, 346 (Tenn. 2008). The trial court is "to be guided by — but not bound by — any applicable enhancement or mitigating factors when adjusting the length of a sentence." *Bise*, 380 S.W.3d at 706. Further, "a trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." *Id.* A sentence imposed by the trial court that is within the appropriate range should be upheld "[s]o long as there are other reasons consistent with the purposes and principles of sentencing, as provided by statute."

*Id.* The appealing party bears the burden of proving that the sentence was improper. *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991).

The Defendant challenges the trial court's refusal to apply mitigating factor (11), that the "defendant, although guilty of the crime, committed the offense under such unusual circumstances that it is unlikely that a sustained intent to violate the law motivated the criminal conduct," arguing that the trial court erred in rejecting this factor because a different trial court applied it in different circumstances to a homicide committed over a struggle for a weapon. *See* T.C.A. § 40-35-113(11); *see also State v. Manolito Jemison*, No. M1999-00752-CCA-R3-CD, 2000 WL 1731288, at *7 (Tenn. Crim. App. Nov. 22, 2000); *but see Herron*, 461 S.W.3d at 904 (this court does not review a trial court's sentencing decision de novo but for abuse of discretion). The Defendant also objects to the trial court's refusal to find that he acted in response to strong provocation; that while not amounting to a defense, substantial grounds existed to excuse his criminal conduct; or that he acted under duress or under the domination of another person. *See* T.C.A. § 40-35-113(2), (3), (12). However, he does not articulate how these determinations were an abuse of discretion. The trial court found as enhancement that the Defendant had no hesitation about committing a crime when the risk to human life was high, although it gave the factor little weight, and the Defendant asserts that this was error, arguing that this factor is inherent in both second degree murder and aggravated assault. T.C.A. § 40-35-114(10); *but see State v. Trent*, 533 S.W.3d 282, 294 (Tenn. 2017) (holding that the factor is applicable "when there is proof that the defendant's conduct in committing the offense created a high risk to the life of someone other than the victim").

The State concedes that the trial court misapplied as enhancement that the offense involved more than one victim because the offenses of second degree murder and aggravated assault were charged as committed against specific, named victims. *See* T.C.A. § 40-35-114(3); *State v. Imfeld*, 70 S.W.3d 698, 706 (Tenn. 2002) (concluding that "there cannot be multiple victims for any one offense of aggravated assault committed against a specific, named victim," in contrast to aggravated arson, which permits only one conviction regardless of the number of persons victimized by a fire). The Defendant does not challenge the trial court's finding that his sentence should be enhanced based on his history of criminal convictions or behavior or the enhancement of the second degree murder convictions based on possession of a firearm during the offense. T.C.A. § 40-35-114(1), (9).

Most germane to our review is the fact that "a trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." *Bise*, 380 S.W.3d at 706. Here, the trial court at sentencing adhered to the mandatory statutory considerations and

referenced the principles and purposes of sentencing.  The court imposed the maximum sentence for the second degree murder convictions, noting that the Defendant perpetrated a senseless killing and that the Defendant was the only person armed.  The proof at trial established that the Defendant armed himself and went to a hotel, allegedly to purchase drugs; that he used the gun to strike Mr. Reid, who was unarmed, breaking his nose and cheekbone; that he pointed the gun at Ms. Haslam, who was likewise unarmed; and that he ultimately shot the unarmed homicide victim nine times, killing him.  We conclude that the trial court did not abuse its discretion in sentencing the Defendant to within-range, concurrent sentences of twenty-five years for second degree murder and ten years for aggravated assault.

## CONCLUSION

Because the principles of double jeopardy prevent a conviction on Count 3, in which the trial court previously entered a judgment of acquittal, we reverse the conviction.  The Defendant's convictions and sentences are otherwise affirmed.

_____
JOHN EVERETT WILLIAMS, PRESIDING JUDGE